IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **PEPTIDE TECH LLC**, a Wyoming Limited Liability Company,<br><br>　　　　　Plaintiff,<br>vs.<br><br>**AVIDIA BANK**, a Massachusetts savings bank,<br><br>　　　　　Defendants. | Civil Action No. |

## COMPLAINT

**COMES NOW** Plaintiff PEPTIDE TECH, LLC (hereinafter, "Peptide") for causes of action against Defendant AVIDIA BANK (hereinafter, "Avidia"), and DOES 1-20, (hereinafter with Avidia, the "Defendants") and alleges as follows:

## PARTIES

1. Peptide is incorporated under the laws of the Commonwealth of Wyoming and maintains its principal address of business at 1309 Coffeen Avenue, Suite 14346, Sheriden, Wyoming.

2. Avidia is incorporated under the laws of the State of Massachusetts and maintains its principal place of business at 42 Main Street, Hudson, Massachusetts.

3. The true names and capacities, whether individual, corporate, associate, or otherwise, of those defendants named herein as Does 1 through 20, inclusive, are unknown to Peptide at this time, who therefore sue the Doe Defendants by such fictitious names. Peptide will amend this Complaint to reflect the true names and capacities of these Doe Defendants once this information has been ascertained. Each Doe Defendant is in some manner responsible, liable, and/or obligated to Plaintiff in connection with the occurrences, transactions, and obligations

1

alleged herein.

4. Each named Defendant and Doe Defendant is, and at all relevant times has been, the undisclosed employee and/or agent of each and every other Defendant and Doe Defendant and was acting within the purpose and scope of that employment and/or agency in performing the acts and omissions alleged herein. Plaintiff is also informed and believes, and on that basis alleges, that each Defendant and Doe Defendant ratified, approved, and adopted as its own the acts of each of the other Defendants and Doe Defendants.

## JURISDICTION AND VENUE

5. The Court has subject matter jurisdiction based on complete diversity between the parties under 28 U.S.C. § 1332, and the amount in controversy exceeds $75,000.

6. Peptide is a citizen of Wyoming.

7. Avidia is a citizen of Massachusetts.

8. This action is appropriately filed in the District Court of Massachusetts pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District and the forum selection clause in the parties' written agreement provides for the exclusive forum in this District.

9. The Court has personal jurisdiction over Avidia as Avidia has waived any objections to jurisdiction in this District per the parties' written agreement.

10. Venue is proper per the Merchant Processing Agreement Section 3.18 (E) setting as the exclusive venue for any and all proceedings in the State of Massachusetts.

11. The Merchant Processing Agreement (*hereinafter, the "MPA"; attached hereto as **Exhibit A***) specifies at Section 3.18(E): "This Agreement shall be governed and construed exclusively in accordance with the laws of the State of Massachusetts without reference to its

conflicts of laws rules. All of the parties hereto, whether or not actually signatories to this document, **agree that the exclusive venue for any and all proceedings relating to this agreement shall be the courts located in the State of Massachusetts**." (*Exhibit A*, at page 7) (emphasis added).

## FACTUAL ALLEGATIONS

A. **General Background on the Electronic Payments Industry**

12. To accept card payments, merchants, like Plaintiff, must first open an account for payment processing services with a payment processer (hereinafter, the "Payment Processor") and a member bank (hereinafter, the "Acquirer") that is contracted with the payment card brands such as Visa USA, Inc., Mastercard International, Inc., Discover Financial Services, LLC, American Express, and/or other networks (hereinafter collectively, the "Card Brands"). Such Acquirers have direct agreements with the Card Brands that enable them to process payments made by holders of debit and credit cards issued by the Card Brands to purchase goods and services from merchants that contract directly with such Acquirers for merchant processing services. This process is called "Acquiring."

13. The Card Brands set forth their own rules and regulations, titled the "Card Brand Rules." The Card Brand Rules govern Payment Processors, Acquirers, and merchants alike. The Acquirers and Payment Processors also set forth their own rules and regulations that similarly govern individuals and entities that participate in the electronic payments industry.

14. Payment Processors in turn may contract with third-party organizations ("Service Providers") that provide payment-processing-related services ("Program Services") to merchants under the Acquirer's sponsorship.

15. A Service Provider is categorized by the Card Brands based on the nature of the

Program Services to be performed. For example, an Acquirer may sponsor a Service Provider as an Independent Sales Organization ("ISO") to solicit merchants for Program Services (e.g. facilitation of underwriting, application processing, onboarding for payment processing, customer service, and statement preparation) on its behalf.

16. The Acquirer must always be entirely responsible for, and must manage, direct and control, all aspects of its Program Services performed by Service Providers, as well as establish and enforce all management and operating policies in accordance with the Card Brand Rules. An Acquirer must not transfer or assign any part of such responsibilities, or in any way limit its responsibilities, with regard to any of its Service Providers. An Acquirer must conduct meaningful monitoring of its Service Providers to ensure ongoing compliance by its Service Providers with the Card Brand Rules.

B. **Background as Pertains to the Parties and the Merchant Processing Agreement**

17. Peptide is a merchant and is engaged in the business of peptide research and chemicals.

18. Avidia is the Acquirer.

19. Peptide has an MPA with Avidia, which allowed Peptide to process payments made by its customers for purchases of Peptides products

20. Soon after Peptide and Avidia (hereinafter, the "Parties") entered into the MPA, Peptide began accepting card transactions for sales of Peptide's products.

21. Peptide expressly identified itself in the category of "Research Chemicals" on its MPA. (*Id.*, at page 2).

22. Peptide markets peptides as "research chemicals" which is NOT an area governed by the Food and Drug Administration ("FDA").

23. Peptide does not sell its product for human consumption. Peptide sells its product to research labs, a distinction that is integral to this lawsuit.

24. Peptides are naturally occurring in the human body and therefore are not subject to any type of patent or protective treatment by the federal government, as it pertains to sales of peptides to research facilities.

25. Peptide's products are made using only GMP (Good Manufacturing Practices), a standard recognized by the World Health Organization and the International Society for Pharmaceutical Engineering. This standard ensures that the products offered for sale by Peptide are above 99% pure (a standard that similar FDA approved peptide medicines cannot meet).

26. No such law or governmental regulations exists which prevents or curtails Peptide's merchandising of GLP-1 products in any way. Furthermore, there is no FDA regulation, promulgation or rule which prevents Peptide from merchandising GLP-1 products.

27. Based upon the stringent underwriting and banking regulations that require Avidia to learn as much as it can about a prospective merchant, including visiting Peptide's website, https://peptidetech.is/, and other confirmation of the legitimacy of the prospective merchant, it is clear that Avidia was fully aware that not only was Peptide selling Peptides, but also it was selling them for **research purposes only**.

28. Peptide has not changed anything about its payment processing, or the products it sells, since the day Peptide entered into the MPA with Avidia.

### C. Avidia's Wrongful Placement of Plaintiff on the MATCH List

29. The Member Alert to Control High-Risk Merchants (MATCH) list is a database maintained by Mastercard that identifies businesses or individuals terminated by Acquirers (banks) due to suspicion of high-risk behavior (e.g. fraud, excessive chargebacks, or regulatory violations), a determination which is often arbitrary and based on a limited if not non-existent investigation. MATCH placement makes it impossible to obtain payment processing services for five years from the date of placement, and Acquirers who place someone on MATCH are traditionally loathed to explain themselves when it comes to justifying an Acquirers placement of a merchant on MATCH, probably because being placed on this list is a death knell for a merchant. Placement on MATCH effectively eliminates a business's ability to accept credit card payments for its product. Presumably, banks reason that to admit anything outside the context of a legal proceeding will definitely result in litigation, and the alternative, just ignoring the merchant and hoping they go away, seems to be the most attractive response for Avidia.

30. On December 5, 2024, Mastercard wrongfully placed Plaintiff on the MATCH list for code violation 10 "Violation of Standards" which Mastercard defines as follows:

> With respect to a Merchant reported by a Mastercard Acquirer, the Merchant was in violation of one or more Standards that describe procedures to be employed by the Merchant in Transactions in which Cards are used, including, by way of example and not limitation, the Standards for honoring all Cards, displaying the Marks, charges to Cardholders, minimum/maximum Transaction amount restrictions, and prohibited Transactions set forth in Chapter 5 of the *Mastercard Rules* manual." 1991-2024 Mastercard Security Rules and Procedures – Merchant Edition – 6 February 2024, p. 138.

31. What this definition of "Violation of Standards" has to do with the sale of peptides is anyone's guess, as Avidia has consistently refused all requests by Peptide that Avidia provide an explanation of what act constituted the "Violation of Standards" and to explain its justification for MATCH placement. On information and belief, Peptide surmises that now that such peptide-based

6

weight lost medications (e.g., Ozempic, Wegovy, etc.) have entered the market, and are being sold for human consumption, rightfully requiring a doctor's prescription, Avidia has decided to "broad brush" terminate and MATCH list all vendors of peptides (there are a host of peptides not related to the weight loss drug), including those who sell peptides for research purposes, which require no doctor's prescription. Peptides product is sold for <u>research purposes only</u>. As such, no doctor's prescription is required. A stark contrast from peptides sold for human consumption, which requires a doctor's prescription. Avidia has decided to treat all peptide vendors the same regardless of who those vendors are selling their peptides to. As such, as it pertains to Peptide, there is no MATCH violation because there was no prohibited transaction, i.e., purchase of a product that requires a doctor's prescription. This is presumably Avidia's motivation for the MATCH placement. MATCH's purpose is to curb payment processing violations of the Card Brands (Visa, Mastercard, etc.). Avidia's goal is to stay in Mastercard's good graces, regardless of whether the MATCH placement is warranted or not. Avidia for its part seems apathetic as to whether it has wrongly destroyed a merchant's ability to sell its product with no basis whatsoever. Avidia is only interested in protecting itself.

32. To sum up, Avidia recommended and/or supported, or by their non-feasance, malfeasance and/or negligence caused, Peptide to be placed on the MATCH list, not only for the arbitrary reason of "Violation of Standards" (for which Avidia refuses to explain or cite what standard and what action caused MATCH placement), but for a selling a product the same way Peptide has been since Avidia elected to accept them. What changed? Why did it necessitate destroying Peptide's business. Simple questions.

33. Like everything else asked of Avidia, there was no response as to whether any of the aforementioned questions in ¶ 32 were asked prior to Avidia's placement of Peptide on the

MATCH list.

34. Avidia's continued refusal to engage as to their placement of Peptide on MATCH has caused Peptide to lose millions in revenue and reputational damage.

35. As a result of the foregoing and Avidia's continued refusal to explain its decision for erroneously placing Plaintiff on the MATCH list has left Peptide with no option except to file this lawsuit.

### COUNT I – DECLARATORY RELIEF
### (As to All Defendants)

36. Peptide realleges and incorporates by reference each and every preceding allegation as if fully set forth herein.

37. A real controversy exists between Peptide and Avidia because Defendants continue to maintain that Peptide should be on the MATCH list.

38. The controversy is bona fide and justiciable in character because it is an actual controversy and extant dispute that is real, definite, substantial, and sufficiently matured so as to be ripe for judicial determination. Avidia refuses to remove Peptide from the MATCH list.

39. Speedy relief requiring Avidia to facilitate Peptide's removal from the MATCH list is necessary to preserve Peptide's rights, as Peptide has suffered damage to reputation and lost sales and is continuing to suffer damage to reputation and lost sales.

### COUNT II – BREACH OF CONTRACT
### (As to All Defendants)

40. Peptide realleges and incorporates by reference each and every preceding allegation as if fully set forth herein.

41. Avidia entered into the MPA with Peptide.

42. Avidia intentionally caused the breach of the Parties' MPA by recommending and/or supporting Peptide be placed on the MATCH list without proper justification.

8

43. Avidia breached the contract by refusing to continue to provide payment processing services to Peptide.

44. As a direct and proximate result of Avidia's unlawful conduct, Peptide has suffered harm, including lost sales, business opportunities, and reputational damage.

**COUNT III – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP**
**(As to All Defendants)**

48. Peptide realleges and incorporates by reference each and every preceding allegation as if fully set forth herein.

49. Peptide had a business relationship with Avidia, and the Card Brands.

50. Avidia, knowing of that relationship, intentionally interfered with that relationship by providing the Card Brands with false information that led to MATCH placement.

51. Avidia interference with Peptide was unfair and improper as the information regarding Peptide's goods was false.

52. Peptide's business has been injured such that Peptide may no longer obtain payment processing from Avidia, or any standard payment processing entity or Acquirer, for at least the next five years, which has already resulted in lost sales, lost business opportunities, and damage to reputation, and which will continue to result in lost sales, lost business opportunities, and damage to reputation.

**COUNT IV – VIOLATION OF MASS. GEN. LAWS CH. 93A**
**(As to All Defendants)**

53. Peptide realleges and incorporates by reference each and every preceding allegation as if fully set forth herein.

54. Avidia's conduct is consumer-orientated in that similarly situated aggrieved entities have neither market nor bargaining power when purchasing payment processing services from Avidia.

55. Avidia's acts were deceptive and misleading in that Avidia represented to Peptide that Avidia would render payment processing services to Peptide, but then refused to do so for unjustified and arbitrary reasons, or no reason at all.

56. Further, Avidia misled the Card Brands into believing Peptide's goods were disapproved when Peptide's goods were and are approved.

57. As a direct and proximate result of Avidia's deceptive and misleading conduct, Peptide has suffered harm, including lost sales, business opportunities, and reputational damage.

58. Peptide is entitled to attorneys' fees.

### COUNT V – VIOLATION OF LANTHAM ACT (15 U.S.C. § 1125)
### (As to All Defendants)

59. Peptide realleges and incorporates by reference each and every preceding allegation as if fully set forth herein.

60. Peptide is engaged in the business of selling peptide for research purposes only that are lawfully approved for sale and distribution without a doctor's prescription.

61. Avidia, in the course of commercial dealings, made false and misleading representations of fact regarding Peptides product.

62. Specifically, Avidia falsely represented to the Card Brands that Peptide's product was not approved, thereby misrepresenting the sponsorship, approval, and legitimacy of Peptide's business.

63. Avidia's statements were false and misleading, as Peptide's product was, in fact, approved for sale.

64. Avidia's misrepresentations were made in commerce and in a manner likely to deceive the Card Brands and others in the industry as to the origin, sponsorship, or approval of Peptide's product.

65. Avidia's false statements have caused confusion and deception in the marketplace, including placement on MATCH, and have harmed Peptide's business relationships and reputation.

66. As a direct and proximate result of Avidia's false and misleading statements, Peptide has suffered damages, including but not limited to lost sales, reputational harm, and business disruption.

### REQUEST FOR RELIEF

WHEREFORE, Peptide demands judgment against Defendants AVIDIA BANK, and DOES 1 through 20, inclusive, jointly and severally as follows:

1. For compensatory damages in an amount to be determined at trial;

2. For injunctive relief compelling Avidia to request Plaintiff's removal from the MATCH list;

3. For all interest allowed by law;

4. For reasonable attorneys' fees to the extent provided by law;

5. For costs of suit to the extent provided by law; and

6. For such other and further relief that the Court considers just and proper.

Respectfully Submitted,

/s/ Joseph Perl
Attorney for Plaintiff
B.B.O. 680509
203 Arlington St., Suite 2
Watertown, MA 02472
781-704-7047
Dated: October 28, 2025