# EXHIBIT A

# Merchant Agreement

300 E Esplanade Drive Suite 1640
Oxnard, CA 93036
Toll Free: 866-587-8249
Email: support@paycosmos.com

Agent: Scott Morley
MCC: 5999
Date: 07/09/2024

Legal Business Name: Peptide Tech, LLC
Merchant Name (DBA): Peptide Tech
Federal Tax ID: 992330704
Web URL: Peptidetech.co
Legal Business Address *(P.O. Box Not Allowed)*: 1309 Coffeen Avenue STE 14346
City: Sheridan   State: WY   Zip: 82801   Phone #: (307) 210-8250   Fax #:
Mailing Address *(If Different from Above)*: 1309 Coffeen Avenue STE 14346
City: Sheridan   State: WY   Zip: 82801   Phone #: (307) 210-8250   Fax #:

**Important Information about Procedures for Opening a New Account**
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. **What this means for you:** When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

**Merchant Acceptance/Bank Disclosure**
Each person signing below
1) agrees that they have received a copy of the terms and conditions [ T&C pages 1-9] associated with this agreement,
2) agrees to all such terms and conditions,
3) agrees that all information provided on this agreement is true, correct, and complete,
4) agrees that they have the legal power and authority to execute this agreement,
5) authorizes the Avidia Bank, 42 Main St, Hudson, MA 01749 (Acquirer) to investigate, either through its own agents or through credit bureaus, all information provided in this agreement and on the individual(s) signing this agreement,
6) agrees that Acquirer may give information to others, including creditors and credit reporting agencies, concerning the Acquirer experience with merchant, and that
7) Acquirer may request additional information as needed. paycosmos is a DBA of Transmodus Corp, an ISO/MSP of Avidia Bank.

**Important Acquirer Responsibilities**
1) Acquirer is the only entity approved to extend acceptance of the Payment Card Brands products directly to a Merchant.
2) Acquirer is responsible for educating Merchants on pertinent Payment Card Brands Operating Regulations with which Merchants must comply.
3) Acquirer, not the ISO, must hold, administer and control all reserve funds derived from settlement.
4) Acquirer, not the ISO, must hold, administer and control settlement funds for the Merchant.
5) Acquirer must be a principal (signer) to the Merchant Agreement.

**Important Merchant Responsibilities**
1) Complying with PCI Compliance, cardholder data security and storage requirements.
2) Maintaining fraud and chargebacks below established thresholds.
3) Reviewing and understanding the Merchant Agreement.
4) Complying with the Payment Card Brands operating regulations.

**The responsibilities listed above do not supersede terms of the Merchant Agreement including the terms and conditions which are provided to ensure the Merchant under-stands some important obligations of each party and that the Payment Card Brands Member— Acquirer—is the ultimate authority should the Merchant have any problems.**

## Owner Information

**Responsible Individual**   100.00 % of ownership   *(A single individual with significant responsibility to control, manage, or direct a legal entity customer.)*

Last Name: Thompson   First Name: James   MI:   Title: Owner
Residence Address:    City: College Station   State: TX   Zip: 77840
Phone:   Email: professorpeptide@gmail.com   Date of Birth:   SSN:
Driver License #:   DL State: TX   DL Issue Date: 07/13/2023   DL Exp Date: 07/23/2031

**First Beneficial Owner**   _____ % of ownership   (An individual or entity who directly or indirectly owns 25 percent or more of the equity interests of a legal entity customer.)

Last Name:   First Name:   MI:   Title:
Residence Address:   City:   State:   Zip:
Phone:   Email:   Date of Birth:   SSN:
Driver License #:   DL State:   DL Issue Date:   DL Exp Date:

**Second Beneficial Owner**   _____ % of ownership

Last Name:   First Name:   MI:   Title:
Residence Address:   City:   State:   Zip:
Phone:   Email:   Date of Birth:   SSN:
Driver License #:   DL State:   DL Issue Date:   DL Exp Date:

## Merchant Business Structure

- ☐ Sole Proprietorship
- ☐ C-Corp (Privately owned)
- ☒ Limited Liability Company (LLC, Ltd, LC, PLLC)
- ☐ Unincorporated Association
- ☐ Government
- ☐ Public Corporation
- ☐ S-Corp (Privately owned)
- ☐ Partnership (LP, LLP, LLLP, GP)
- ☐ Not for Profit
- ☐ Other _____

Stock symbol, if the merchant is a publicly held company _____

Entity Formation Date: 2024-04-03

Current Location Start Date: 2024-04-03

Previous Credit/Debit Card Processor of Financial Institution: Payment Tech

Reason for Changing Processor: Business

Merchandise/Services Sold *(restaurant, clothing, auto, etc)*: Research chemicals

## Processing Volumes *(Based on Monthly Activity)*

- Average Ticket $ 250.00
- Max Ticket $ 2500.00
- # of Transactions: 1500
- # of Refunds: 0
- # of Chargebacks: 15
- Visa/MasterCard/Discover® Volume $ 250000.00
- American Express Volume $ 50000.00

## Method of Acceptance *(Totals must equal 100%)*

- Swiped 0.00 %
- Keyed (MO/TO) 0.00 %
- Internet 100.00 %
- What % of sales are to: Business consumer ____ % Individual consumer ____ %

## Terminal Information *(To be completed by sales agent)*

| # | Terminal Build | Connectivity | PIN-pad | Auto Batch? | Batch Time | Industry | Notes |
|---|---|---|---|---|---|---|---|
| 1 | NMI Gateway | Select | Select | Select | | Select | Connect to Shopify |
| 2 | | Select | Select | Select | | Select | |
| 3 | | Select | Select | Select | | Select | |

## Merchant Site Survey Report *(To be completed by sales agent)*

Location: ☐ Store Front  ☐ Office Building  ☐ Warehouse  ☐ Residence  ☐ Other _____  Merchant: ☐ Owns  ☐ Leases

| Yes | No | | Yes | No | |
|---|---|---|---|---|---|
| ☐ | ☐ | Merchant appears to be conducting business as represented in this agreement. | ☐ | ☐ | Have you taken pictures inside and outside of the premises? |
| ☐ | ☐ | Merchant as adequately staffed and stocked to do business. | ☐ | ☐ | Have you confirmed the identity of the person who signed the contract? |
| ☐ | ☐ | Merchant has posted any business license(s) required to do business. | ☐ | ☐ | Have you confirmed the signor as owner/principal of the business? |

Comments _____

- ☐ I hereby verify that I have physically inspected the business premises at this address.
- ☐ I also verify that all information submitted in this agreement is correct to the best of my knowledge and belief.

Inspected by / Sales Agent *(print)*: Scott Morley

Agent #: 51020003008001

## MO/TO, Internet Questionnaire *(Complete this section only if method of acceptance is more than 25% for MO/TO, Internet)*

Describe your refund policy in detail *(attach sheet if necessary)*: No Returns or Refunds after carrier confirms possession of package unless certain criteria is met.

Method of Marketing: ☐ Newspaper/Magazine  ☐ TV/Radio  ☐ Internet  ☐ Direct mail, brochure and/or catalog  ☐ Outbound telemarketing sales

Percentage of products sold via: Phone orders ____ %  Mail/Fax orders ____ %  Internet orders ____ %  Other ____ %

Who processes the order?  ☐ Merchant  ☐ Fulfillment center  ☐ Consumer  ☐ Other  ☐ N/A

Who enters credit card information into the processing system?  ☐ Merchant  ☐ Fulfillment center  ☐ Consumer  ☐ Other

If credit card information is taken over the internet, is payment system encrypted by SSL or better?  ☐ Yes  ☐ No

Do you own the product/inventory?  ☐ Yes  ☐ No  ☐ N/A  Is product stored at your location?  ☐ Yes  ☐ No  ☐ N/A  If No, where? _____

After charge authorization, how long until the product ships? *(days)* _____  ☐ N/A  Who ships the product?  ☐ Merchant  ☐ Fulfillment center  ☐ N/A

Product shipped by?  ☐ US Mail  ☐ Other  ☐ N/A  Delivery receipt requested?  ☐ Yes  ☐ No  ☐ N/A

## Electronic Debit/Credit Authorization

Merchant hereby authorizes Bank, or third party in accordance with this agreement, to initiate debit/credit entries to Merchant's deposit account, as indicated below. This authority is to remain in full force and effect until (a) Bank has received written notification from Merchant of its termination, in such a manner as to afford Bank reasonable opportunity to act on it and (b) all obligations of Merchant to Bank that have arisen under this Agreement have been paid in full. This authorization extends, but is not limited, to such entries to this account which concern discount fees, transaction fees, chargebacks, penalties, service fees, return items fees, lease, rental and purchase charges involving Point-of Sale ("POS") and credit card imprint equipment.

**Bank Name** Chase                                      **Name on Account** Peptide Tech LLC

**Routing #** 111000614                                  **Account #** _____

You have the option of accepting Visa credit cards, MasterCard credit cards, Discover cards, American Express Cards, credit cards issued by MasterCard signature debit cards (MasterMoney Cards) or Visa signature debit cards (Check Cards). You may elect to accept any or all of these card types for payment.

Accept American Express:    ☐ Yes    ☐ No    If Yes, ☐ Create OptBlue Account, or    ☐ Use Existing Account #_____

☐ By checking this box, Merchant opts out of receiving future commercial marketing communications from American Express.
- You may continue to receive marketing communications while American Express updates its records to reflect your choice.
- Opting out of commercial marketing communications will not preclude you from receiving important transactional or relationship messages from American Express
- American Express may use the information obtained in the Merchant application at the time of setup to screen and/or monitor Merchant in connection with Card marketing and administrative purposes.

The following resolutions were duly adopted by the board of directors/managing member(s)/general partners (check one) of the Merchant Company WHEREAS, the Merchant Company desires to enter into a Merchant Agreement (the "Merchant Agreement") with Acquirer ("Bank"). NOW, THEREFORE, BE IT RESOLVED, that the Merchant Agreement by and among the Merchant, Bank and ISO, is hereby approved and adopted in the form provided by ISO, together with such additions, changes or modifications as may be deemed necessary, advisable or appropriate by the officer(s) executing or causing the same to be completed; and RESOLVED FURTHER, that in connection with the Merchant Agreement, the appropriate officer(s) of the Merchant Company is/are hereby authorized to establish (a) an Operating Account into which funds from credit card sales by the Merchant Company will be directed, and (b) if necessary, a Reserve Account into which funds from credit card sales by the Merchant Company may be directed by Bank in accordance with the provisions of the Merchant Agreement; RESOLVED FURTHER, that the Merchant Company hereby grants Bank a security interest in the funds held by the Merchant Company in the Operating Account and Reserve Account, and the appropriate officer(s) of the Merchant Company is/are hereby authorized to execute all documents reasonably required by Bank to perfect such security interests; RESOLVED FURTHER, that the appropriate officer(s) of the Merchant Company is/are hereby authorized to enter into such additional agreements, and take such additional actions as may be reasonably required by Bank or ISO in connection with the Merchant Agreement; and RESOLVED FURTHER, that the Secretary/managing member/general partner (circle one) of the Merchant Company is hereby authorized to deliver to Bank and to ISO an Incumbency Certificate, (i) identifying the officers of the Merchant and (ii) verifying the signatures of such officers, as well as a copy of these resolutions, certified by the Secretary of the Merchant (or authorized member or partner), and Bank and ISO are hereby authorized to rely on such Incumbency Certificate and certified copy of these resolutions until formally advised by an authorized officer/member/partner of the Merchant in writing of any changes therein, accompanies by a replacement of the Incumbency Certificate. I hereby certify under penalty of law, that I have the legal power and have been duly authorized by the company applying for a merchant processing account, to execute this agreement on behalf of the company listed on page one of this Merchant Processing Agreement. Each person listed below (an "Officer") (i) holds the office in the Merchant Company indicated opposite his or her name on the date hereof, (ii) the signature appearing opposite his or her name in the Merchant Acceptance section of Agreement, is the genuine signature of each such officer, (iii) each such Officer, acting individually, is authorized to execute and deliver the Merchant Agreement and each of the agreements and documents contemplated by the Merchant Agreement (collectively, the "Transaction Documents") on behalf of the Merchant Company, and (iv) each such Officer, acting individually, is authorized to perform the Merchant Company's obligations under the Transaction Documents on behalf of the Merchant Company.

## Guaranty

For value received and in consideration of the mutual undertakings contained in the Merchant Agreement between Merchant and the undersigned Acquirer, the individuals signing on behalf of Merchant (jointly and severally if more than one), in such person's individual capabilities and not on behalf of Merchant unconditionally guaranty to Acquirer, the full and prompt payment when due of all of the obligations of every kind and nature of Merchant arising directly or indirectly in accordance with the terms of the Merchant Agreement. The undersigned further agree in such person's individual capabilities and not on behalf of Merchant to pay Acquirer all expenses (including attorney's fees and court costs) paid or incurred in collecting such obligations and in enforcing the Guaranty.

## *Certificate of Authority* (check one)

☐ **Corporate Resolution (Corporations and LLC Only):**
The above signed certifies that (1) he/she is duly elected and qualified official of the corporation whose full legal name appears on the Merchant Application, (2) he/she is duly authorized on behalf of the corporation to contract with the Acquirer and to act on behalf of the corporation in all matters relating to the Merchant Regulations, (3) Acquirer may rely upon this authorization Merchant provides written notice of any change

☐ **Partnership Certificate (Partnerships and LLP Only):**
Partnership Certificate (Partnerships and LLP Only): The above signed certifies that (1) he/she is the General Partner or other official of the partnership authorized, for and on behalf of this partnership, to enter into this agreement with Acquirer, and to take such other action relating to said agreement, as he/she may from time to time deem appropriate in connection with the participation by this partnership in bank card interchange systems known as the Visa, MasterCard, Discover Network Systems, and/or ATM Debit Networks, (2) the partners, employees, and agents of this partnership are authorized, for and on behalf of this partnership, to make and deliver sales slips, credit memoranda, electronic transaction records and other instruments to Acquirer, in connection with this partnership's participation in the above system, And (3) his/her authority will continue in full force and effect until Acquirer, shall receive official notice in writing from this partnership of the revocation hereof by such organization.

☐ **Non-profit Organization Authorization (Non-Profit Organizations Only):**
The above signed certifies that (1) he/she is authorized, for and on behalf of the Board of Trustees or governing authority, to enter into an agreement or agreements, with Acquirer, and to take such other action relating to said agreement or agreements, as he/she may from time to time deem appropriate in connection with the participation by this organization in bank card interchange systems known as the Visa, MasterCard, Discover Network Systems, and/or ATM Debit Networks, (2) the partners, employees, and agents of this organization are authorized, for and on behalf of this organization, to make and deliver sales slips, credit memoranda, electronic transaction records and other instruments to Acquirer, in connection with this organization's participation in the above systems, and (3) the authority conferred is in addition to the authority conferred by any other resolution delivered to Acquirer, and will continue in full force until Acquirer, shall receive official notice in writing from this organization of the revocation hereof by a resolution duly adopted by the governing authority of this organization.

Dated this: 09    Day of Jul    Year 2024        paycosmos as a DBA of Transmodus Corp
                                                  Name of ISO/MSP

Peptide Tech, LLC                                 300 E Esplanade Drive, Suite 1640 Oxnard CA 93036
Print Name of Merchant Business                   ISO/MSB Address

James Thompson                                    X_____
Print Name of Owner, Responsible Individual       Authorized Officer of paycosmos as a DBA of Transmodus Corp

X *James Thompson*                                X_____
Signature of Owner, Responsible Individual        Authorized Officer of Avidia Bank

# Merchant Agreement Terms and Conditions

These terms and conditions constitute an integral part of the Merchant Processing Agreement ("Agreement"). In consideration of the covenants set forth below, Acquirer, which is a member of Visa U.S.A. Inc. ("Visa"), MasterCard International ("MasterCard"), Discover®, American Express® Travel Related Services Company, Inc. (AXP) or jointly with Visa/MasterCard/Discover/American Express ("Payment Card Brands") and the undersigned merchant ("Merchant") have agreed as follows as of the date of acceptance of this Agreement by Acquirer, as an affiliate of Acquirer for the purposes of providing merchant services.

## ARTICLE I – CARD TRANSACTIONS

**1.01 Honoring Cards**
A. Merchant, whether dealing with the public or otherwise, shall honor, in a non-discriminatory manner, all valid Visa/MasterCard/Discover/AXP cards ("Cards"), of the type(s) indicated when properly presented as payment in connection with bona fide, legitimate business transaction;
B. Merchant shall not require a Cardholder to provide identification information such as telephone number, address or driver's license number as a condition of completing a transaction unless permitted by applicable state law and allowed by the rules and regulations ("Card Issuers' Regulations") of a Card Issuer Visa/MasterCard/Discover/AXP (issuers shall hereinafter be referred to collectively as "Card Issuers");
C. Merchant may not make a photocopy of a Card under any circumstances nor request that the Cardholder provide a photocopy of the Card as a condition for honoring same.
D. Surcharging
  1) Merchant must notify Acquirer of merchant's intent to surcharge cardholder a minimum of 30 days prior to doing so.
  2) Merchant must complete notification to Visa at www.visa.com/merchantsurcharging
  3) Merchant must complete notification to MasterCard at www.mastercard.us.merchants/support/surchargerules.html
  4) Merchant must complete notification to Discover at https://servicecenter.discovernetwork. com/msc/exec/contactForm.do
  5) Merchant must disclose surcharging to cardholders prominently and near the point of sale device.
  6) Surcharge must be displayed on the cardholder's receipt as a separate line item while being included in the total transaction amount.
  7) Merchant must NOT surcharge debit cards, prepaid cards or check cards.
  8) Merchant MAY NOT surcharge cardholder an amount which is more than the merchant is charged. Also, a maximum cap of 4% applies.
  9) Merchant agrees to refund surcharge amount on a transaction which is refunded. Merchant agrees to partially refund a surcharged amount pro-rated on a partially refunded transaction.
  10) Merchant agrees if a transaction with a surcharge amount is disputed, the total transaction will be charged back including the surcharged amount.
  11) Merchant agrees not to surcharge cardholders if specifically prohibited by state law in which the business is governed.
  12) Merchant agrees these rules not are totally inclusive, and Merchant agrees to read and understand the totality of each payment card brand's rules by visiting each website PRIOR to engaging in surcharging any cardholders.
E. The Card Brands permit any U.S. merchant to set a minimum transaction amount (not to exceed USD 10 or any higher amount established by the Federal Reserve by regulation) to accept cards that access a credit account. The Brands do not permit merchants to set a minimum transaction amount to accept cards that access a debit account or greater than $10 on credit cards or a maximum dollar transaction amount.
F. Merchant shall not require cardholder to complete a post card or similar device that includes the account holders account #, expiration date, signature or any other account data in plain view when mailed.
G. Merchant or Agent may not request card verification value 2 (CVV2) data on any paper order form.

**1.02 Advertising**
A. Subject to: i) private clubs, ii) Merchants who do not deal with the public, iii) vehicle leasing companies at airport locations, iv) transportation companies subject to government regulation, or v) Merchants expressly exempted from by Card Issuers' Regulations, Merchant shall adequately display advertising or promotional material provided or required to inform the public that Cards are honored at Merchant's place of business;
B. Merchant shall not display or use advertising or promotional materials containing Acquirer's name or symbol, which might cause a customer to assume that Merchant honors only Cards issued by Acquirer;
C. Merchant shall have the right to use or display the proprietary names and symbols associated with Cards only while this Agreement is in effect, or until Merchant is notified by Acquirer or any appropriate Bank Card organization to cease such usage;
D. Merchant shall comply with all applicable Card Issuer Regulations concerning the use of service marks and copyrights owned by Visa/MasterCard/Discover/AXP;
E. Merchant shall use the proprietary names and symbols associated with Cards only to indicate that Cards are accepted for payment and shall not indicate, directly or indirectly, that Acquirer, Visa/MasterCard/Discover/AXP or any Payment Card organization endorses Merchant's products or services;
F. Merchant shall not refer to Visa/MasterCard/Discover/AXP in stating eligibility for its products, services, or memberships.

**1.03 Card Examination**
A. Merchant agrees to carefully examine any Card security features (such as hologram) included on the Card; compare the embossed account number on the face of the Card with the account number indented on the signature panel; check the validity date and expiration date of the Card; and shall not honor any invalid or expired Card without proper, prior authorization;
B. Where the magnetic stripe on the Card is read in connection with a transaction, Merchant shall compare the embossed account number on the Card to the number displayed or printed by the terminal to verify they are the same;
C. Except for mail orders, telephone orders or pre-authorized transactions, Merchant shall not complete a transaction without presentation of the Card by the Cardholder and proper examination by the Merchant of the Card;
D. If the signature panel on the Card is blank, Merchant shall:
  1) Review the positive identification to confirm identity. Such identification must consist of a current, official government identification document (such as a passport or driver's license) bearing Cardholder's signature; and
  2) Indicate such positive identification (including any serial numbers and expiration date) on the sales draft if the transaction is a Visa transaction, and if permitted by applicable state law. (Such information shall not be recorded for MasterCard transactions); and
  3) Require Cardholder to sign the signature panel on the Card before completing the transaction; and
  4) Request authorization.
E. In the case of a Visa Card, Merchant shall compare the printed issuing bank identification number, which is directly above the first four digits of the embossed account number. If the printed number and the embossed number do not match, Merchant shall call the voice authorization number and request a "code 10" operator.

**1.04 Authorization**
A. Before honoring any Card, Merchant is required to request authorization from Acquirer's designated authorization center.
B. Authorization numbers, or positive account number verification response codes, as appropriate, shall be printed legibly in the designated area on the sales slip.
C. If authorization is denied, Merchant shall not complete the transaction and shall use its best efforts by reasonable and peaceful means to follow any instructions from the authorization center.
D. Merchant shall be liable to Acquirer, regardless of any authorization, if Merchant completes a transaction when the Cardholder is present but does not have his Card, the Cardholder does not sign the sales slip, or the signature on the sales slip does not match the signature appearing on the Card, or the signature panel on the Card is blank.
E. In no event shall an authorization be deemed to be Acquirer's representation that the particular transaction is in fact a valid, authorized or undisputed transaction entered into by the Cardholder or an authorized user of the Card.
F. Where authorization is requested for transaction involving suspicious or unusual circumstances the Merchant shall call and request a "code 10" authorization from Acquirer's designated authorization center.
G. An authorization for a restaurant transaction, in which a gratuity is added to the sales slip by the Cardholder, is valid if the total transaction amount is within 20% of the authorization amount.
H. If authorization is obtained for the estimated amount of a car rental transaction, Merchant shall disclose to Cardholder the amount authorized on the rental date.

**1.05 Retention and Retrieval of Cards**
Merchant shall use its best efforts, by reasonable and peaceful means, to retain or recover a Card;
A. If Merchant receives a negative response from the account number verification service, and until Merchant receives further instruction from Acquirer's designated authorization center;
B. While making an authorization request;
  1) If Merchant is advised to retain the Card in response to an authorization request; or
  2) Where the embossed account number, indent printed account number and/or encoded account number do not match, or an unexpired Card does not have the appropriate hologram on the Card face; or
  3) If the Merchant has reasonable grounds to believe the Card is counterfeit, fraudulent or stolen. The obligation of Merchant to retain or recover a Card imposed by this section does not authorize a breach of the peace or any injury to persons or property, and Merchant will hold Acquirer harmless from any claim arising from any injury to person or property or other breach of the peace. If a recovered Card is retained by a law enforcement agency, Merchant shall forward a legible copy of the front and back of the Card to Acquirer, or other bankcard organization, as appropriate, to support payment of any applicable reward.

**1.06 Completing the Transaction Record**
Except as provided below, Merchant agrees to do all of the following when honoring a Card;
A. To enter on the sales slip the transaction date, a description of the goods or services sold, and the price thereof (including any applicable taxes) in detail sufficient to identify the transaction
B. To obtain the signature of the customer on the sales slip after the transaction amount is identified in the "total" column;
C. To compare the signature on the sales slip and the signature panel of the Card,

and if the Card has a photograph of the Cardholder, to verify identity, and if either identification is uncertain or the account numbers are not the same or Merchant otherwise questions the validity of the Card, to contact Acquirer's authorization center for instructions;
D. To imprint legibly on the sales slip the embossed legends from the Card and from the Merchant imprinter plate. If the imprinter does not legibly imprint, Merchant shall legibly detail the Card- holder's name and account number and Merchant's name and place of business, as well as the name or trade style of the issuer as it appears on the face of the Card, the ICA number, the Card initials, if any, and both the effective date and expiration date. Merchant shall also record on the sales slip any other embossed data such as security symbols.
E. To deliver a true and completed copy of the sales slip to the customer at the time or delivery of the goods or performance of the services or for point of transaction terminal transactions, at the time of the transaction.
F. For transactions, which originate at and are data-captured using point-of-sale transaction terminals. Merchant must include the following on the Cardholder copy or the sales draft;
  1) The Cardholder account number
  2) Merchant's name
  3) Merchant's location code or city and state
  4) The amount of the transaction
  5) The transaction date
G. Transaction records must be produced for all transactions, which originate at and are data- captured using automated dispensing machines or limited-amount terminals, except for transactions that originate at magneticstripe-reading telephones. Such transaction records must include at least the following information;
  1) The Cardholder account number
  2) Merchant's name
  3) The magnetic-stripe-reading terminal location code or city and state
  4) The amount of the transaction
  5) The transaction date
H. Whenever the encoded account number cannot be read from the magnetic stripe, Merchant shall follow normal authorization procedures and complete the approved transaction using a manual imprinter.

## 1.07 Multiple Transaction Records; Partial Consideration

A. Merchant must include on one transaction record the entire amount due for the transaction, except in the following instances:
  1) The transaction involves purchases made in separate departments of a multi-department store;
  2) The transaction involves delayed or amended charges for a vehicle rental transaction in which:
    a. The Cardholder consented to be liable for such charges; and
    b. Such charges consist of ancillary or corrected charges such as taxed or fuel fees, and not charges for loss, theft, damage, or traffic violations;
  3) Merchant sends the Cardholder a copy of the amended or add-on sales drafts (sales drafts for such delayed or amended charges may be deposited without the Cardholder signature provided that Merchant has Cardholder's signature on file and the words "SIGNATURE ON FILE" are entered onto the signature panel of the sales draft);
  4) The customer pays a portion of the transaction amount in cash, by check, with any Card, or any combination of such payments at the time of the transaction and further provided that Merchant obtains authorization for that part of the transaction effected with a Card;
  5) All or a portion of the goods or services are to be delivered or performed at a later date and the customer signs two separate sales slips, one of which represents a deposit and the second of which represents payment of the balance, and the balance sales slip is completed only upon delivery of the goods or performance of the services, in which case Merchant agrees:
    a. To note on the sales slips the word "Deposit" or "Balance" as appropriate and the words "Delayed Delivery"
    b. If the total amount or the two slips exceeds the applicable floor limit, to obtain prior authorization and note the authorization date an approval code in the sales slips; and
    c. Not to present the "Balance" sales slip until all goods are delivered or all the services are performed; or
    d. The Cardholder is using the installment payment option offered in accordance with Paragraph 1.08.
    e. Merchant agrees not to divide a single transaction between two or more transaction re- cords to avoid obtaining an authorization.
    f. For sales processed at electronic POS terminals, multiple items individually billed to the same account will not be considered a violation of this Agreement if separate authorizations are obtained for each item.

## 1.08 Telephone Order, Mail Orders, Preauthorized Orders, and Installment Orders

A. If the transaction is a telephone order (TO) mail order (MO), or preauthorized order (PO), the sales slip may be completed without a customer's signature or a Card imprint, however Merchant shall:
  1) Print legibly on the sales slip sufficient information to identify the Card issuer, Merchant and the Cardholder, including: Merchant's name and address, the Card issuers' name or trade style, ICA number and bank initials (if any), the account number, the expiration date and any effective date on the Card, the Cardholder's name, and any company name, and
  2) Print legibly on the signature line of the sales slip the letter "TO","MO" or "PO" (recurring transaction for Visa transaction), as appropriate.
  3) Obtain authorization for every sale for MO and TO transactions, authorization must be obtained no more than 7 calendar days before the transaction date. Merchant shall attempt to obtain the expiration date of the Card as part of the authorization inquiry.
B. On any non-imprinted or expired Card transaction, Merchant shall be deemed to warrant the customer's true identity as an authorized user of the Card, whether or not authorization is obtained, unless Merchant obtains and notes legibly on the sales slip independent evidence of the customer's true identity.
C. In connection with a recurring transaction (or pre-authorized order) pursuant to which goods or services are delivered to or performed for a Cardholder periodically, Merchant agrees to the following conditions:
  1) Merchant must obtain a written request from the Cardholder that the recurring transaction is charged to the Cardholder's account;
  2) The written request must specify the amount of the recurring transaction (or allow space for Cardholder to specify a minimum and maximum amount if the recurring transactions are to be for varying amounts), the frequency of the recurring charges, and the length of time for which the preauthorized order is to remain in effect;
  3) Before renewing a preauthorized order, Merchant must obtain a subsequent written request from the Cardholder containing the information listed above;
  4) Merchant must not deliver goods or perform services covered by a preauthorization order after being advised that the preauthorization has been canceled by cardholder or that the Card is not being honored; and
  5) Except as provided in Paragraph 1.07, a recurring transaction may not include partial payments to Merchant for goods or services purchased in a single transaction, or for periodic payments of goods or services on which Merchant assesses additional finance charges.
  6) Merchant must inform Cardholder that he has the right to receive, at least 10 days prior to each scheduled transaction date, written notice of the amount and date of the next charge.
    Cardholder may elect to receive the notice
    a. For every charge
    b. Only when the transaction amount does not fall within the specified range shown on the order form, or If the total
    c. Only when the transaction amount will differ from the most recent charges charge by more than an agreed upon amount.
D. Merchant may offer Cardholders an installment payment option for its mail/telephone order merchandise subject to the following conditions; Merchant's promotional material must clearly disclose the installment terms, including but not limited to:
  1) Whether the plan is available only for selected items or for the total amount or any order; and
  2) How shipping and handling charges and applicable taxes will be billed. The material also must advise Cardholders who are not billed in the transaction currency of the Merchant that the installment billing amounts may vary due to fluctuations in the currency conversion rates;
  3) Merchant may add no finance charges. The sum of the installment transactions may not exceed the total sales price of the merchandise on single transaction bases;
  4) Authorization is required for each installment transaction. Merchant's floor limit is zero
  5) Merchant may not deposit the first installment transaction with Acquirer until the merchandise is shipped. Subsequent installment transactions must be deposited;
  6) At intervals of 30 days or more; or
  7) On the anniversary date of the transaction {i.e. the same date each month}
  8) In addition to Merchant's name, an appropriate installment transaction descriptor (e.g. 1 of 5, 2 of 5) must be included in the Merchant name field of the learing record.

## 1.09 Vehicle Rental Transactions

Regardless of the terms and conditions of any written preauthorization form, the sales slip amount for any vehicle rental transaction shall include only that portion or the transaction, including any applicable taxes, evidencing a bona fide renting of personal property by Merchant to a customer and shall not include any consequential charges. Nothing herein is intended to restrict Merchant from enforcing the terms and conditions of its preauthorization form through means other than a Card transaction.

## 1.10 Returns and Adjustments; Credit Slips

A. If with respect to any transaction, any merchandise is accepted for return or any services are terminated or canceled, or any price adjustment is allowed by the Merchant (other than involuntary refunds by airlines or other carriers when required by applicable tariffs and except where otherwise required by law or governmental regulations.) Merchant shall not make any cash refund to the Cardholder but shall deliver promptly to Acquirer a credit slip evidencing such a refund or adjustment.
B. Each credit slip shall be signed and dated by Merchant and include the transaction date, a description of the goods returned, services canceled, or adjustment made and the amount or the credit in sufficient detail to identify the transaction and the embossed data from the Card and Merchant's imprinter plate
C. The refund or adjustment shall be indicated on a credit slip and may not exceed the original transaction amount.
D. The Merchant may limit its return, adjustment, refund or exchange policies provided that proper disclosure is made and purchased goods or services are delivered to the Cardholder at the time of the transaction.
E. Proper disclosure by the Merchant must be given at the time of the transaction by printing the following words or similar wording on all copies of the sales slip or invoice being presented to the Cardholder for signature in letters approximately

1/4-inch-high and in close proximity to the space provided for the Cardholder's signature;
1) "NO REFUND" for a Merchant which may not accept merchandise in return or exchange and may not issue a refund to a Cardholder.
2) "EXCHANGE ONLY" for a Merchant which may accept merchandise in immediate exchange for similar merchandise of a price equal to the amount of the original transaction
3) "IN STORE CREDIT ONLY" for a Merchant which may accept merchandise in return and deliver to the Cardholder an In-store credit for the value of the merchandise returned which may be used only in the Merchant's place(s) of business

F. A Merchant may, if permitted by applicable law, stipulate special circumstances under which a surcharge shall be assessed for the use of a Card. The wording to appear on the sales slip shall be any special terms of the transaction(s).

G. Merchant must deliver to the Cardholder a true and completed copy of the credit slip to the time of the credit transaction. Merchant shall not process a credit slip without having completed the purchase transaction with the Cardholder and in no event may the credit exceed the amount of the original transaction.

### 1.11 Cash Payments

Merchant shall not receive any payments from a customer for charges included on any transaction record resulting from the use of any Card, nor receive any payments from a Cardholder to prepare and present a credit slip for the purpose or affecting a deposit to the Cardholder's account.

### 1.12 Cash Advances

Unless expressly authorized in writing by Acquirer, Merchant agrees not to make any cash advance to a Cardholder, either directly or by deposit to the Cardholder's account. Money orders sent by wire, contribution to charitable and political organizations, tax payments, insurance premium payments, alimony and child support payments, and court costs and fines shall not be considered cash advances or withdrawals. Merchant shall not obtain, under any circumstance, authorization for nor process a sale or cash advance on any card Merchant is authorized to use. Processing Merchant's own card or the processing of an unauthorized cash advance is grounds for immediate termination.

### 1.13 Disclosure and Storage of Transaction Information

A. Except as otherwise required by law, Merchant shall not, without the Cardholder's and Acquirer's prior written consent, sell, purchase, provide, or otherwise disclose the Cardholder's account information or other Cardholder information to any third party other than Acquirer's or Merchant's agents and processing organizations for the purpose of assisting Merchant in its business.
B. Merchant and any agent of Merchant shall store in an area limited to selected personnel and prior to discarding, shall destroy in a manner rendering data unreadable all material containing Cardholder account number Card imprints, such as sales slips and credit slips, car rental agreements and carbons.
C. Merchant or any agent of Merchant shall not retain or store magnetic stripe data subsequent to the authorization of a transaction.
D. Merchant further warrants and agrees that in the event of its failure, including bankruptcy, insolvency or other suspension of business operations, it will not sell, transfer, or disclose any materials that contain Cardholder account numbers, personal information or transaction information to any third parties, and shall return the information to Acquirer or provide acceptable proof of destruction to Acquirer.
E. Merchant shall notify Acquirer if it utilizes any third party or third-party software products to process, store or transmit any information with respect to transactions.

## ARTICLE II – PRESENTMENT PAYMENT AND CHARGEBACK

### 2.01 Transmission of Data

In lieu of depositing paper sales slips and credit slips with Acquirer, Merchant may transmit to Acquirer, in the form of magnetic tape or electronic data, as specified and acceptable to Acquirer, all data required to appear on the sales slip or credit slip. The term "sales data" as used herein shall mean the data transmitted by Merchant contained in a sales slip or the electronic or magnetic tape record that is the equivalent of such sales slip. The term "credit data" as used in this Agreement shall mean the data transmitted by Merchant contained in a credit slip or the electronic or magnetic tape record that is equivalent thereto. All data (transaction records) transmitted shall be pre-sorted and organized in a form and format approved and/or instructed in advance by Acquirer. All references to "sales slips" and "credit slips" in this Agreement shall be deemed to include transaction records transmitted by paper, electronically or on magnetic tape.

### 2.02 Presentment of Transaction Records to Acquirer

A. Merchant may designate a third party who does not have a direct Agreement with Acquirer as its agent for delivering transactions data-captured at the point of sale by such agent if Merchant elects to use such agent. Merchant agrees to the following conditions (for purposes of this Para- graph 2.02, "Merchant" includes any such permitted agent):
1) Merchant must provide satisfactory notice to Acquirer that Merchant chooses to exercise the option specified above
2) The obligation of Acquirer to reimburse Merchant for transactions is limited to the amount (less the applicable or appropriate discount fee) delivered by Merchant's designated Agent; and
3) Merchant is responsible for its agent's failure to comply with applicable Credit Card Issuer and/ or Merchants Regulations, including, but not limited to, any violation resulting in a chargeback.

B. Merchant shall present all sales data relevant to a transaction, except that:
1) Merchant shall present no sales data until goods have been shipped or the services have been performed and Merchant has otherwise performed all of its principal obligations to the customer in connection with the transaction unless the Cardholder agreed to a delayed delivery of goods and proper disclosures were made at the time of the transaction;
2) When Merchant requests and receives authorization for delayed presentment and legibly prints on the sales slip the authorization number and the words "Delayed Presentment", Merchant must present the sales data within the permitted period for delayed presentment (not to exceed 30 calendar days).
3) If Merchant is obligated by law to retain a sales slip or return it to a buyer upon timely cancellation, Merchant must present the sales data within 10 bank business days after the date of the transaction; and
4) When Merchant has multiple locations or offices and accumulates transaction records at a central facility, Merchant must present the transaction records to Acquirer within 20 calendar days after the transaction date. Merchant with multiple locations must deliver the transaction records in such manner that Acquirer is able to identify the transactions originating at each location.

C. Merchant shall deliver all credit data to Acquirer within 3 bank business days after the credit transaction date, except if Merchant has multiple locations as described in Paragraph (B/4) above, Merchant must deliver the credit data to Acquirer within 7 business days after the transaction date.
D. Merchant shall not present to Acquirer, directly or indirectly, any transaction record that Merchant knows or should have known: to be fraudulent, illegal, or not authorized by the Cardholder; results from transaction outside Merchant's normal course of business; that results from a transaction not involving Merchant; that contains the account number of a Card account issued to Merchant; or was not the result of a transaction between Merchant and Cardholder.
E. If the transmission of sales data or credit data from Merchant to Acquirer is in the form of magnetic tape or electronic data, Merchant shall preserve a copy of the sales and credit slips pursuant to Paragraph 3.03.
F. Merchant is prohibited from re-depositing any transaction that has previously been charged back and subsequently returned to Merchant. This prohibition applies with or without the Cardholder's consent of the Merchant's actions. Merchant may, at its option, pursue payment from the customer in such event.
G. Merchant shall not deposit duplicate Transactions. Merchant shall be debited for any duplicate Transactions and shall be liable for any Chargebacks and any fines or penalties levied by the Payment Card Brands, which may result therefrom.
H. Merchant shall not present any Transaction representing the refinancing of an existing obligation of a Cardholder including, but not limited to obligations:
1) Previously owed to Merchant,
2) Arising from the dishonor of a Cardholder's personal check, and/or
3) Representing the collection of any other pre-existing indebtedness, including collection of delinquent accounts on behalf of third parties.

### 2.03 Acceptance and Discount

Subject to the provisions of any agreement of Merchant hereunder and of any chargeback right, Acquirer agrees to accept valid transaction records from Merchant during the term of this Agreement and to pay Merchant the total amount represented by the transaction records less any percentage discount and fees agreed to by the parties. In this regard, Merchant understands and agrees that any fee or charge provide herein is that which is to be initially applicable and imposed and such fees and charges may be increased or otherwise amended from time to time by Acquirer with or without advance notice to Merchant except as otherwise herein specifically provided. Any payment made by Acquirer to Merchant shall not be final but shall be subject to subsequent review and verification by Acquirer and may be subject to chargeback until the chargeback period expires.

### 2.04 Insecurity

Notwithstanding Paragraph 2.03, Acquirer may withhold payment to Merchant or prohibit Merchant's withdrawal of funds then on deposit with Acquirer for any of the following reasons:
A. Acquirer is suspicious of any transaction records;
B. Merchant's volume of sales exceeds a stipulated amount or amounts that are typically generated during a particular period;
C. Merchant's average ticket amount exceeds a stipulated amount;
D. Merchant does not swipe Cards through electronic terminals;
E. Merchant fails to authorize transaction;
F. Acquirer receives excessive retrieval request against Merchant's account as prior activity;
G. Excessive chargebacks are debited against Merchant's account as prior activity; or
H. If for any other reason, including but not limited to fines or penalties that are, or Acquirer reasonably assumes will be, assessed against Merchant based on its violation of any Card Issuer Regulations, and/or its breach of this Agreement such that Acquirer reasonably determines that withholding funds or preventing withdrawals of funds previously deposited with Acquirer is necessary to cover anticipated charges, fines and/or penalties resulting from Merchant's Card activities.

### 2.05 Endorsement

Merchant agrees that Merchant shall be deemed to have endorsed in Acquirer's favor any transaction records Merchant presents to Acquirer and Merchant hereby authorizes Acquirer to supply such endorsement on Merchant's behalf.

### 2.06 Prohibited Payment

Merchant agrees that Acquirer has the sole right to receive payments on any accepted transaction record as long as:

A. Acquirer has paid Merchant the amount represented by the transaction record less the discount and fees; and
B. Acquirer has not charged such transaction record back to Merchant unless specifically authorized in writing by Acquirer. Merchant agrees not to make or attempt to make any collections on any transaction record, and promptly to deliver the same in kind to Acquirer as soon as received, together with the Cardholder's name and account number and any correspondence accompanying the payment.
C. A merchant may not accept a Card for an unlawful Internet gambling transaction.
D. Merchant will pay all Card Association fines fees, penalties and all other assessments or indebtedness levied by Card Associations to Bank which are attributable, at the Bank's discretion, to Merchant's Transaction processing or business.

### 2.07 Chargeback
A. Under any one or more of the following circumstances, Acquirer has accepted, and Merchant shall repay Acquirer the amount represented by the transaction record:
   1) The transaction record or any material information on a sales slip (such as the account number, expiration date of the Card, Merchant description, transaction amount, or date), is illegible, incomplete, is not endorsed, or is not delivered to Acquirer within the required time limits;
   2) The transaction received a negative account verification service response (or would have received a negative account verification service response if Merchant had contacted the service on the transaction date) and Merchant did not reject the transaction or receive prior authorization for the transaction, as applicable;
   3) The sales slip does not contain the required imprint of a Card that was valid, effective, and unexpired on the transaction date;
   4) The transaction was one for which prior credit authorization was required and prior credit authorization was not obtained, or a valid authorization number is not correctly and legibly included on the transaction record;
   5) The transaction record is a duplicate of an item previously paid, or is one of two or more transaction records generated in a single transaction in violation of this Agreement;
   6) The Cardholder disputes the execution of the transaction record, the sale, delivery, quality, or performance of the goods or services purchased, or alleges that a credit adjustment was requested and reissued or that a credit adjustment was issued by Merchant but not posted to the Cardholder's account;
   7) The price of the goods or services shown on the transaction record differs from the amount shown on the copy of the sales slip or the receipt delivered to the customer at the time of the transaction;
   8) Acquirer reasonably determines Merchant has violated any term, condition, covenant, warranty, or other provision of this Agreement in connection with the transaction record or the related transaction;
   9) Acquirer reasonably determines the transaction record is fraudulent or that the related trans- actions were not a bona fide transaction in Merchant's ordinary course of business, or is subject to any claim of illegality, cancellation, recession, avoidance, or offset for any reason whatsoever, including without limitation negligence, fraud, or dishonesty on the part of Merchant or Merchant's Agents or employees;
   10) The transaction record arises from a mail or telephone order transaction which the Card- holder disputes entering into or authorizing, or which involves an account number that never existed or that has expired and has not been renewed;
   11) Merchant fails to provide any sales slip or credit slip to Acquirer in accordance with Para- graph 3.01 of this Agreement.
   12) Any other Merchant transaction charged back to Acquirer for whatever reason pursuant to Card Issuer Regulations.
B. In the event Merchant believes a chargeback to be improper, Merchant must notify Acquirer of this in writing within 10 calendar days of the date of the chargeback or forfeit its right to contest the chargeback.
C. Except in the case of chargebacks based solely on the Merchant's failure to obtain an authorization, Acquirer may chargeback a transaction in accordance with this section even if an authorization was obtained in connection therewith. Merchant's obligation to reimburse, indemnify Acquirer for the amount of any chargeback shall survive termination of this Agreement.
D. Guarantors are personally liable for all chargebacks. In the event Merchant sells its business, and the new owner incurs chargebacks from transactions during the period Guarantors owned business, the original Merchant and all guarantors will continue to be held personally liable for the chargebacks.

### 2.08 Merchant's Business
A. Merchant shall provide Acquirer with immediate notice of its intent to
   1) Transfer or sell any substantial part of its total assets, or liquidate;
   2) Change the basic nature of its business, including selling any products or services not related to its current business;
   3) Change fifty percent (50%) or more of the ownership or transfer control of its business;
   4) Enter into any joint venture, partnership or similar business arrangement whereby any person or entity not a party to this Agreement assumes any interest in Merchant's business; or
   5) Alter in any way Merchant's approved monthly volume and average ticket;
   6) Make changes to the Merchant's Account;
B. Failure to provide notice as required above may be deemed a material breach and shall be sufficient grounds for termination of this Agreement, or, at Acquirer option may result in Acquirer amending the terms of this Agreement, including, but not limited to, holding funds and/or altering the Merchant funding schedule if Acquirer deem it necessary to protect against financial loss. If any of the changes listed above occur, Acquirer shall have the option to re-negotiate the terms of this Agreement or provide immediate notice of termination;
C. Failure to provide Acquirer with the merchant's correct federal tax identification number(s) with the completed processing agreement may result in fines assessed to the merchant. Moreover, failure to provide Acquirer with an updated federal tax number(s) for the merchant within 15 days of any change may result in fines assessed to the merchant; Merchant will
D. immediately notify Acquirer of any bankruptcy, receivership, insolvency or similar action initiated by or against Merchant or any of its principals. Merchant will include Acquirer on the list of creditors filed with the Bankruptcy Court, whether or not a claim exists at the time of filing;
E. Merchant must notify Acquirer, in writing of any changes to the information in the Merchant Agreement, including but not limited to: a change to Merchant's financial condition (within 3 days), any additional location or new business, the identity of principals and/or owners, the form of business organization, type of goods and services provided, and how sales are completed. Merchant must also notify Acquirer in writing if Merchant sells or closes its business. Except for a change to the financial condition, Acquirer must receive all such notices 7 days before the change. Merchant will provide updated information to Acquirer upon request. Merchant is liable to Acquirer for all losses and expenses incurred by Acquirer arising out of Merchant's failure to report changes. Acquirer may immediately terminate this Agreement upon a change to the information in the Merchant Agreement, whether Acquirer independently discovers such change or whether Merchant notifies Acquirer of such change.
F. Merchant covenants that: (a) each Transaction Record presented to Provider for collection is genuine and is not the result of any fraudulent activity, or a Transaction prohibited by a Card Network, or is not being deposited on behalf of any business other than Merchant as authorized by this Agreement; (b) each Transaction Record is the result of a bona fide purchase of goods or services from Merchant by the Cardholder in the total amount stated on the Transaction Record;(c) Merchant will perform all of its obligations to the Cardholder in connection with the Transaction evidenced thereby; (d) Merchant will comply with Provider's procedures for accepting Cards, and the Transaction itself will not involve any element of credit for any other purposes other than as set forth in this Agreement, and will not be subject to any defense, dispute, offset or counterclaim which may be raised by any Cardholder under the Network Rules, the Consumer Credit Protection Act (15 USC §1601) or other Law; and any Credit Voucher which Merchant issues represents a bona fide refund or adjustment on a Transaction by Merchant with respect to which a Transaction Record has been accepted by Provider.

## ARTICLE III – MISCELLANEOUS

### 3.01 Imprinters and Terminals
A. Merchant shall keep all imprinter(s) and terminal(s) used to process Card transactions in good working order and shall notify Acquirer prior to any change in imprinted or programmed information.
B. Merchant is required to immediately notify in writing Acquirer in the event a Point of Sale terminal becomes lost or stolen.
C. If Merchant chooses not to purchase their credit card terminal(s) and equipment at the time of enrollment, Merchant shall pay a monthly Equipment Fee to paycosmos. This fee, listed on the Schedule A, is required for a term of (3) years. If the merchant terminates the agreement prior to 36 monthly payments, the full amount outstanding will be due at the time of termination.

### 3.02 Forms
Merchant shall use only such forms or modes of transmission for sales data and credit data as are provided or approved in advance by Acquirer, and Merchant shall not use forms or equipment provided by Acquirer other than in connection with Card transactions hereunder.

### 3.03 Records
A. Merchant shall, for Visa/MasterCard/Discover/AXP purposes, preserve a copy of the actual paper sales slips and credit slips for at least 6 months after the date Merchant presents the transaction data to Acquirer, and Merchant shall make and retain for at least 3 years from such date legible microfilm copies of both sides of such actual p per transaction records.
B. Merchant agrees to immediately notify Acquirer of any Merchant location(s) added after the date of this Agreement and agrees to the establishment of a separate processing account for said location(s).

### 3.04 Request for Copies
A. Within 1 business day of receipt of any request by Acquirer, Merchant shall fax or mail to Acquirer either the actual paper transaction record, if requested by Acquirer, or a legible copy thereof (in size comparable to the actual paper transaction records), and any other documentary evidence available to Merchant and reasonably requested by Acquirer to meet its obligations under law (including its obligations under the fair credit billing act) or otherwise to respond to questions concerning Cardholders accounts.
B. For purposes of retrieval or records, Merchant must retain sale slips and credit slips by reference number within date sequence.
C. If Merchant does not provide a requested copy of sales slip(s) to Acquirer within the time frame specified in addition to other rights and remedies available to Acquirer under this Agreement:
   1) Acquirer may charge Merchant a penalty fee; and
   2) Acquirer may charge Merchant the transaction amount of the requested sales slip.

3) Acquirer may, at its option, charge Merchant the transaction amount of the requested sales slip at the time of the request. Such amount will be reimbursed to the Merchant upon delivery of a valid and correct sales slip.

**3.05 Disputes with Cardholder; Indemnification of Acquirer**
All disputes between Merchant and any Cardholder relating to any Card transaction shall be settled between Merchant and such Cardholder. Merchant shall defend, indemnify and hold Acquirer harmless from all claims, liabilities, damages, losses (including but not limited to those arising from fraud or similar activities whether or not Merchant participated in any way), and expenditures (including but not limited to investigation expenses, research time, reasonable attorney's fees and other costs of defense whether or not provided by Acquirer's personnel or others) relating to or arising out of any such Card transactions and/or from Merchant's failure to comply with any of its obligations under this Agreement. In addition, at any time deemed necessary in Acquirer's sole discretion, Acquirer may require an increase in the sums held in reserve, or if no reserve has been previously provided, may require that sums be held in reserve from sums otherwise due Merchant in order to protect Acquirer and its agents against potential claims, liabilities, losses and/or expenditures. Notwithstanding the foregoing however, Acquirer shall not be obligated to apply such reserve and may instead require prompt payment, indemnity and/or contribution directly from Merchant. The obligations under this Paragraph 3.05 shall survive termination of this Agreement.

**3.06 Excessive Chargebacks and/or Retrievals**
Merchant agrees that in the event Acquirer is presented, during any monthly period, with charge- backs and/or retrieval requests relating to the transactions of the Merchant processed by Acquirer in excess of one percent (1%) of interchange volume of such transactions, such chargeback and/or retrieval requests will conclusively be deemed to be excessive under applicable Card Issuer Regulations which shall allow Acquirer to take such action as may be authorized herein or by applicable Card Issuer Regulations, including, but not limited to, terminating this Agreement and/or passing through to Merchant any charges and/or penalties that may be imposed by Visa/MasterCard/Discover/AXP. In addition to any other remedies provided herein, Acquirer may impose an excessive chargeback fee of Twenty-Five Dollars ($25) per occurrence if Merchant's monthly chargeback volume exceeds one percent (1%) of monthly sales.

**3.07 Terms, Termination and MATCH and/or the Consortium Merchant Negative File (the CMNF) published by Discover (formerly Combined Terminated Merchant Files "CTMF")**
A. The initial term of this Agreement shall be three (3) years from the date this Agreement is executed by Acquirer. Thereafter, the Agreement will automatically renew for additional consecutive three (3) year terms, unless Merchant notifies Acquirer of its intention not to renew the Agreement at least ninety (90) days prior to the end of the Agreement term then in effect. Merchant's obligations under this Agreement remain in full force and effect relative to all transactions submitted under this Agreement prior to the date of termination. This Agreement may be terminated at any time by Acquirer upon written notice to the Merchant for any activity that may create harm or loss to the goodwill of any Association or to the Bank. Such notice shall be effective when hand delivered or three (3) days following the date the notice is deposited in the mail or upon any late date specified in the notice. Acquirer may terminate this Agreement without prior notice in the event Merchant is or becomes bankrupt or is unable to pay its debts as they become due, or if Acquirer reasonably determines that Merchant has violated any term, condition, covenant, or warranty of this Agreement, or if Acquirer determines in its sole discretion that Merchant has abused its privileges under this Agreement.
B. Upon the effective date of any such termination, Merchant's rights hereunder to make Card transactions, to deposit transaction records with Acquirer, and to use sales slip forms, credit slip forms, promotional material, and any other items provided by Acquirer hereunder shall cease, but Merchant's obligations in connection with any transaction record accepted by Acquirer (whether before or after such termination), including without limitation Merchants chargeback obligations, shall survive such termination.
C. Merchant expressly acknowledges that a MATCH/CMNF file is maintained by Visa/MasterCard/ Discover/AXP containing information on Merchants terminated for one or more reasons specified in Visa/MasterCard/Discover/AXP operating rules and regulations. Such reasons generally include, but are not limited to; fraud, counterfeit paper, unauthorized transaction, excessive chargebacks or highly suspect activity. Merchant acknowledges that Acquirer is required to report the Merchant business name and the names of its principals to MATCH/CMNF when Merchant is terminated due to one or more of the foregoing reasons. Merchant expressly agrees and consents to such reporting by Acquirer in the event of the termination of this Agreement due to one or more of such reasons.

**3.08 Limitation of Liability**
Acquirer's liability to Merchant or to any party claiming by, through or under Merchant, shall be limited in the aggregate for the term of this Agreement (as may be extended) to the average of one month's fees paid by the Merchant for the services rendered hereunder by Acquirer. In determining the average of the month's fees, the fees paid for the three months' ending on the last day of the month immediately preceding the month in which Acquirer first sends notice of a claim to Merchant shall be averaged. Merchant waives all claims against Provider for any loss, claim, demand, penalty, action, delay, cost or expense (including reasonable attorneys' fees) of any kind unless Merchant provides written notice to Provider of the occurrence that gave rise to the alleged liability within thirty (30) days after Merchant knew or should have known of the occurrence. Merchant will indemnify and hold Provider harmless from any claim relating to any Transaction Record paid for by Provider as may be made by anyone by way of defense, dispute, offset, counterclaim or affirmative action, or for any damages of or losses that Provider may incur as a result of Merchant's breach of this Agreement. Further, Merchant will reimburse Provider for all expenses and costs, including attorneys' fees, with regard thereto. Merchant acknowledges that the fees for the services provided to Merchant by Provider are very small in relation to the funds advanced to Merchant for Transactions and consequently Provider's willingness to provide these services is based on the liability limitations contained in this Agreement. Therefore, in addition to greater limitations on Provider's liability that may be provided elsewhere (including the per Transaction Record limitation above), any liability of Provider under this Agreement, whether to Merchant or any other party, whatever the basis of the liability, will not exceed, in the aggregate, an amount equal to the lesser of (a) the fees paid by Merchant to Provider during the last three (3) months, exclusive of fees and variable costs incurred by Provider to process Transactions, such as interchange costs, assessments and fees imposed by a third party or (b) fifty thousand dollars ($50,000). This Agreement is a service agreement. Acquirer disclaims all other representations or warranties made to Merchant or to any other person. Acquirer shall in no event be liable for any incidental, exemplary, punitive, indirect or consequential damages whatsoever, regard- less of whether such damages were foreseeable or whether any party or entity has been advised of the possibility of such damages. Acquirer is not liable to Merchant for errors made by account number verification service or for Merchants failure to contact same.

**3.09 Supplementary Documentation; Fees; Fines and Penalties**
All reference herein to this "Agreement" shall collectively include current schedules, amendments, Merchant agreement, change notices, addendum, appendices and attachments and associated reference materials, all or which are incorporated herein by reference and made a part of this Agreement as if fully set forth. Merchant agrees to pay the fees and charges identified in this Merchant agreement or in any other schedule of fees and charges provided to Merchant, which may be amended from time to time as provided in Paragraph 3.18. All fees and charges charged to the Merchant shall be presumed correct unless the Merchant notifies Acquirer in writing within thirty
(30) days from the date of a monthly statement which includes the disputed item. Merchant shall be liable to Acquirer for all fees, fines and penalties that may be assessed against Acquirer by either Visa/MasterCard/Discover/AXP as a result of Merchant's activities hereunder. An administrative fee will be applicable.

**3.10 Compliance with Law; PCI Security Program, Non-Disclosure and Storage of Card- holder and Transaction Information Requirements**
Merchant confirms that it is, and shall be, in full compliance during the term of this Agreement with all laws, statutes and federal and/or state regulations, as well as rules and operating regulations and bylaws imposed by Visa/MasterCard/Discover/AXP applicable to Merchant, its business and any Card transaction, including without limitation all state and federal consumer credit and consumer protection statutes and regulations, non-disclosure of Cardholder information and transaction documents, and other security procedures adopted by Visa/MasterCard/Discover/AXP. Merchant hereby certifies that it (and any outside agent that it may utilize to submit transactions to Acquirer and/or third-party software provider) complies with the Payment Card Industry ("PCI") instituted by Visa/ MasterCard/Discover/AXP. Merchant hereby agrees to pay any fines and penalties that may be assessed by Visa/MasterCard/Discover/AXP as a result of Merchant's breach of this paragraph, including but not limited to any fines or penalties that may be assessed based on its noncompliance with the requirements of PCI, or by its failure to accurately validate its compliance, or as a result of any data breaches resulting from its storage of Cardholder information. The Merchant must review and/ or monitor the requirements at https://www.pcisecuritystandards.org to determine compliance under PCI. As part of this Agreement, Merchant must validate PCI compliance by completion of annual Self-Assessment Questionnaires and if applicable, quarterly system scans with an Approved Scan- ning Vendor as determined by the PCI Security Standards Organization. The foregoing is an ongoing obligation during the term of this Agreement and as it may be renewed. Merchant acknowledges and understands that Merchant may be prohibited from participating in Visa/MasterCard/Discover/AXP programs if it is determined that Merchant is noncompliant. The following lists certain of the current PCI requirements, all of which Merchant shall comply with, if applicable: (i) install and maintain a working network firewall to protect data accessible via the Internet; (ii) keep security patches up-to-date;(iii) encrypt stored data; (iv) encrypt data sent across networks; (v) use and regularly update anti-virus software; (vi) restrict access to data to business "need to know;" (vii) assign a unique ID to each person with computer access to data; (viii) do not use vendor supplied defaults for system passwords and other security parameters; (ix) track access data by unique ID; (x) maintain a policy that addresses information security for employees and contractors; and (xi) restrict physical access to Cardholder information.
A. Merchant agrees to validate compliance with the requirements of the Payment Card Industry (PCI) Data Security Standards, including, but not limited to, satisfactory completion and submission of Self-Assessment Questionnaires (SAQs), and quarterly system scans if determined as necessary by the PCI Data Security Standards on a continual basis. Merchant will be provided with the tools and resources required to complete the validation process. Failure to provide successful PCI validation will cause the Merchant to be subject to a monthly PCI Non-Compliance Fee. The PCI Non-Compliance fee will be assessed ninety (90) days after approval of Merchant account if merchant has not validated PCI compliance, or after any ninety (90) day consecutive period for which Merchant was not in compliance with validation standards.
B. Compliance with Card Network Rules. Merchant represents, warrants and covenants that it is and will remain throughout the Term of this Agreement in compliance with (i) Network Rules related to data security, data integrity and the safeguarding of Cardholder Information, including the Payment Card Industry Data

Security Standard ("PCI"), Discover Information Security Compliance ("DISC"), MasterCard's Site Data Protection Program ("SDP"), the American Express Data Security Requirements ("DSR"), and Visa's Customer Information Security Program ("CISP"), in effect and as may be amended, supplemented or replaced from time to time, and (ii) any data security guidelines or operating guide that Provider may provide to Merchant, as the same may be amended, supplemented or replaced from time to time. Merchant will cause all of its service providers, subcontractors and agents to comply with PCI, SDP, DISC, DSR and CISP requirements and any data security guidelines or operating guide provided by Provider at all times. Merchant will report any non-compliance immediately to Provider. To accomplish the foregoing, Merchant will encrypt all debit, credit or stored value card numbers whether in storage, transport or backup and will not store data security codes on its systems, network or software.

C. Annual Certification. Merchant will provide an annual certification to Provider if requested by Provider (in a form acceptable to Provider) certifying compliance with the data security provisions of this Agreement, including compliance with applicable Card Network requirements such as PCI, SDP, DSR and CISP. Merchant will provide annual certifications for Merchant's service providers, subcontractors and agents.

D. Merchant agrees that Provider may disclose to any Card Network information regarding Merchant and Merchant's Transactions to any Card Network, and that such Card Network may use such information to perform its responsibilities in connection with its duties as a Card Network, promote the Card Network, perform analytics and create reports, and for any other lawful business purposes, including commercial marketing communications purposes within the parameters of Card Network Card acceptance, and transactional or relationship communications from a Card Network. A Card Network may use the information about Merchant obtained in this Agreement at the time of setup to screen and/or monitor Merchant in connection with the Card Network marketing and administrative purposes. Merchant agrees it may receive messages from a Card Network, including important information about Card Network products, services, and resources available to its business. These messages may be sent to the mailing address, phone numbers, email addresses or fax numbers of Merchant. Merchant may be contacted at its wireless telephone number and the communications sent may include autodialed short message service (SMS or "text") messages or automated or prerecorded calls. Merchant agrees that it may be sent fax communications.

E. Merchant acknowledges that the sale or disclosure of databases containing Cardholder account numbers, personal information, or other Transaction information to third parties is strictly prohibited by the Rules. Unless Merchant obtains consents from Bank, and each applicable Association, issuing bank and Cardholder, Merchant must not use, disclose, sell or disseminate any Cardholder information obtained in connection with a Transaction (including without limitation, the names, addresses and Card account number of Cardholders, copies of imprinted sales drafts and/or credit records, mailing lists, tapes or other media obtained in connection with a sales draft and/or credit record) except for purposes of authorizing, completing and settling Transactions and resolving any Chargebacks, retrieval requests or similar issues involving Transactions other than pursuant to a court or governmental agency request, subpoena or order. Merchant shall use proper controls for, limit access to, and render unreadable prior to discarding all records containing Cardholder account numbers and Card imprints.

F. Each party hereto shall report its income and pay its own taxes to any applicable jurisdiction, if required to pay any taxes, interest, fines, or penalties owed by merchant, set amount shall become immediately due and payable by merchant to Bank. If excise sale or use taxes are imposed on transactions, merchant shall be responsible for the collection and payment thereof. Merchant shall not add any tax to any transaction unless applicable Law expressly provides that merchant is permitted to impose tax, and any such tax amount, is so allowed shall be included in the transaction amount and not collected separately. Bank shall be entitled to recover from merchant any of said taxes paid by it on behalf of merchant immediately after payment.

G. Forensic Investigations – The merchant, if undergoing a forensic investigation, must fully cooperate with the investigation until completed.

H. Merchant agrees to notify the acquirer of its use of any service provider that will have access to Cardholder data.

**3.11 Modification**
This Agreement is subject to such modifications, changes, and additions as may be required, or deemed by Acquirer to be required by reason of any state or federal statute, judicial decision, Visa/ MasterCard/Discover/AXP rule or regulation, or the regulation or ruling of any federal agency having jurisdiction over Acquirer or Merchant.

**3.12 Changes in Transmission Mode**
The means of transmission indicated below shall be the exclusive means utilized by Merchant for the transmission of sales data or credit data to Acquirer. Merchant shall give Acquirer at least thirty (30) days prior written notice of Merchants desire to deliver and deposit actual sales slips and credit slips or otherwise to alter any material in respect to Merchants medium of transmission of sales data and credit data to Acquirer. Following termination, Merchant shall upon request provide Acquirer with all original and microfilm copies required to be retained as of the date of termination.

**3.13 Penalty Fees**
A. Acquirer, for the following reasons, may charge a higher discount fee rate on transactions with the following event(s):
1) Batches not closed within two (2) business days of the earliest transaction date in the batch;
2) Non-authorized transactions over floor limit
3) Credit cards not swiped through POS terminal;
4) Terminal did not read the entire content of the magnetic stripe
5) Transaction did not meet Visa/MasterCard/Discover/AXP requirements for the best discount fee rate.
6) Actual monthly processing volume exceeds approved monthly volume in this Agreement.

**3.14 Description of Fees**
A. Discount Fees
1) Retail Qualified Rate: Swiped consumer credit or check Card transactions that are electronically authorized and closed in a daily batch and include all minimum authorization and transaction information as required for the Visa Custom Payment Service ("CPS") or MasterCard Merit III interchange programs.
2) MO/TO & Internet Qualified Rate: Mail Order, Telephone Order or Internet key-entered transaction where the Card is not present and an Address Verification Service is required. Must be a consumer credit or check Card transaction and is electronically authorized and closed in a daily batch and includes all minimum authorization and transaction information as required for CPS Card not Present or CPS Key-Entered or MasterCard Key-Entered interchange programs.
3) Mid-Qualified (Retail only): Includes consumer credit and check Card transactions that are a) key-entered, b) not settled within two business days, c) made with cards that have missing or unreadable magnetic strip data, d) made using a Visa Rewards Card at a T&E Merchant, e) made when the Card is not present.
4) Non-Qualified (Retail, MO/TO & Internet): All credit and check Card transactions that do not meet the requirements of the other rate categories. Also includes any transactions made on any Visa Corporate and Signature Card types, MasterCard Commercial or WorldCard Card types or any foreign cards.

**3.15 Early Termination**
If Merchant terminates this Agreement before the end of the initial three (3) year term or during any subsequent term, Merchant shall be obligated to immediately pay Acquirer or its representative, as liquidated damages, an Early Termination Fee of $195.00 in addition to any other monthly fees (Early Termination Processing Fees) in the Merchant Processing Agreement for the remaining term of the Agreement. The early termination fee referred to in this paragraph shall also be assessed by Acquirer in the event it terminates this Agreement based upon Merchant's breach of its terms as set forth in Paragraph 3.07(a).

**3.16 Independent Sales Organization/Member Service Provider**
A. Merchant acknowledges that:
1) Acquirer may use an Independent Sales Organization (ISO) or Member Service Provider (MSP) operating under applicable Card Issuer Regulations who is an independent contractor and not an agent of Acquirer,
2) No ISO or MSP has authority to execute this Agreement on Acquirer's behalf or to alter the terms hereof without Acquirer's prior written approval.

**3.17 Security Interest; Set Off and Reserve Account**
A. To secure all obligations of Merchant to Acquirer arising from this Agreement, Merchant hereby grants Acquirer a first lien security interest in all deposits, regardless of source, to Merchant's checking account (specified in the Merchant agreement including, but not limited to, three deposit accounts listed under bank references) and all proceeds of said deposits. Acquirer's rights under said security interest may be exercised by Acquirer without notice or demand of any kind by making and immediate withdrawal from or freezing said account upon Acquirer's reasonable determination that a breach of any obligation or Merchant under this Agreement has occurred for any reason specified in Paragraph 2.04. The exercise of Acquirer's rights pursuant to this security interest shall be in addition to any other rights of Acquirer under this Agreement. Acquirer shall also have the right to require Merchant to furnish such other and different security as Acquirer shall deem appropriate in its sole discretion in order to secure Merchant's obligations under this Agreement. Merchant agrees to execute any documents or take any actions required in order to comply with and perfect the security interest under this paragraph. Acquirer may, at any time there is an obligation owing from Merchant to Acquirer, offset any such amounts against any deposit balances or other money now or hereafter owed Merchant by Acquirer without notice or demand of any kind. In the event the merchant does not comply with this agreement in fulfilling their obligations, the Acquirer may have to refer to an outside collection company. Should this occur, the merchant and its guarantors will be liable for additional fees which would include the agency fees, attorney cost, plus the entire balance owed to the Acquirer.

B. Reserve Account
1) Establishment. Merchant will establish and maintain a non-interest-bearing deposit account ("Reserve Account") with Acquirer initially or at any time in the future as required in Acquirer's good faith discretion, with sums sufficient to satisfy Merchant's current and future obligations as determined by Acquirer. Acquirer may establish a Reserve Account on behalf of Merchant by depositing incoming items into a Reserve Account if it determines in good faith such a reserve is necessary, included but not limited to a determination that transactions are outside of the risk parameters indicated by Merchant on the Merchant Processing Agreement. Merchant authorizes Acquirer to debit the Merchant checking account to establish or maintain funds in the Reserve Account. Acquirer may deposit into the Reserve Account any funds it would otherwise be obligated to pay to Merchant, for the purpose of establishing or maintaining the Reserve Account in accordance with this Section, if it determines such action is reasonably necessary to protect its interests.
2) Authorizations. Acquirer may, without notice to Merchant, apply deposits in the

Reserve Account against any outstanding amounts Merchant owes under this Agreement or any other agreement between Merchant and the Acquirer. Also, Acquirer may exercise its rights under this Agreement to collect any amounts due to Acquirer including, without limitation, rights of set-off and recoupment.

3) Funds. Funds in the Reserve Account will remain in the Reserve Account until 270 days following termination of this Agreement, or 270 days after last activity on account, provided however, that Merchant shall remain liable to Acquirer for all liabilities occurring beyond such 270-day period. Acquirer will have sole control of the Reserve Account. Funds which are unable for any reason to be disbursed upon fulfillment of all merchant obligations will incur a monthly fee in order to maintain the account.

C. In cases where merchant agrees to receive expedited funding of receivables, paycosmos reserves the right to advance receivables from its demand deposit account and recoup the funds by directing merchant's receivables to its own demand deposit account. Merchant shall not assign to any third party any payments due to it under this Agreement, and all indebtedness arising from Transactions will be for bona fide sales of goods and services (or both) at its business locations and free of liens, claims, and encumbrances other than ordinary sales taxes; provided, however, that Merchant may sell and assign future Transaction receivables to Provider, its affiliated entities and/or any other cash advance funding source that partners with Provider or its affiliated entities, without consent from any Card Network. Notwithstanding the foregoing, Provider prohibits Merchant from selling or assigning future Transaction receivables to any third party without Provider's prior written consent.

**3.18 General**

A. The paragraph headings and captions contained in this agreement are for convenience only and should not be deemed to define limit or describe the scope or intent of this agreement to the extent that they conflict with the Substance of this Agreement.
B. This Agreement shall be binding upon and insure to the benefit of the parties hereto and their successors and assigns; provided, however this Agreement may not be assigned by Merchant without the written consent of Acquirer. Any such assignment by Merchant without Acquirer's prior written consent shall be null and void.
C. Should any provision of this Agreement contravene any law, or valid regulation to rule of any regulatory agency of self-regulatory body having jurisdiction over either party hereto, or should any provision of this Agreement otherwise be held invalid, or unenforceable by a court or other body of competent jurisdiction, then each such provision shall be automatically terminated and performance hereof by both parties waived, and all other provisions of this Agreement then in effect shall never the less remain in full force and effect.
D. No failure by Acquirer to insist upon strict performance of any term or obligation set forth in this Agreement or to exercise any right or remedy under this Agreement nor acceptance of partial performance during continuance of default hereunder, shall constitute a waiver of any such term, obligation, right or remedy, or a waiver of any such default by Acquirer.
E. Applicable law; venue and mutual jury trial waiver. This Agreement shall be governed and construed exclusively in accordance with the laws of the State of Massachusetts without reference to its conflicts of laws rules. All of the parties hereto, whether or not actually signatories to this document, agree that the exclusive venue for any and all proceedings relating to this agreement shall be the courts located in the State of Massachusetts. Furthermore, as material condition to one another in entering into said agreement, each of the parties hereby waive their right to trial by jury in any action or proceeding based upon, arising out of, or in any way relating to this agreement or the relationship between or among said parties, whether sounding in contract or tort or otherwise.
F. In any action to enforce any obligation under this Agreement, the party who does not prevail shall pay to the prevailing party all costs, expenses and reasonable attorneys' fees.
G. Acquirer may amend this Agreement, including changes in fees and/or fee schedules, at any time by providing a writing setting forth the amended fee. Acquirer shall endeavor, depending upon business practicalities, to provide up to 30 days' notice prior to the effective date of any such amendment. (Also see Acquirer's right to amend or impose reserve requirements and to indemnify Acquirer against costs as provided in Paragraph 3.05 hereof).
H. All notices or other communications required to be given by either party shall be in writing and shall be effective when hand delivered, emailed, or sent by United States mail, postage prepaid (whether or not sent with a Merchant Statement) and shall be deemed to be given when hand delivered or upon deposit in email or the mail as indicated. Notices shall be addressed to the parties at the address identified below, or such other address as may be specified by either party by notice to the other party.
I. Acquirer may appoint an Agent(s) to do or take any actions that may be done or taken by Acquirer under this Agreement.
J. This Agreement is intended by the parties as a final expression of and a complete and exclusive statement of the terms of this Agreement there being no conditions to the enforceability of this Agreement. This Agreement may not be supplemented or modified except in writing as provided in this Agreement.
K. Effective date or start date of agreement begins when merchant agreement is accepted and boarded onto ISO systems. This effective date may vary from merchant acceptance signature date on agreement.

**3.19 Electronic Debit/Credit Authorization**
Merchant authorizes Acquirer or third party in accordance with this Agreement, to initiate debit/ credit entries to Merchant's deposit account, as indicated on Merchant Processing Agreement. This authorization is to remain in full force and effect until:

A. Acquirer has received written notification from Merchant of its termination, in such a manner as to afford Acquirer reasonable opportunity to act on it and
B. All obligations of Merchant to Acquirer that have arisen under this Agreement have been paid in full. This authorization extends, but is not limited, to such entries to this account which concern discount fees, transaction fees, chargebacks, penalties, service fees, return item fees, lease, rental and purchase charges involving Point-Of-Sale ("POS") and credit Card Imprint equipment.
C. Merchant shall regularly and promptly review all statements of account, banking statements, and other communications sent to Merchant and to immediately notify Acquirer if any discrepancy exists between Merchant's records and those provided by Acquirer or with respect to any transfer that Merchant believes was not authorized by Merchant or Customer. If Merchant fails to notify Acquirer in writing within fourteen (14) calendar days after the date that Acquirer mails or otherwise provides a statement of account or other report of activity to Merchant, Merchant will be solely responsible for all losses or other costs associated with any erroneous or unauthorized transfer. The foregoing does not limit in any way Merchant's liability for any breach of this Agreement.

**3.20 Representations and Warranties of Merchant**
Merchant represents and warrants to Acquirer at the time of execution and during the term of this Agreement that:
A. All information contained in the Merchant Agreement or any other documents delivered to Acquirer in connection therewith is true and complete and properly reflects Merchant's business, financial condition and principal partners, owners or officers;
B. Merchant has the power to execute, deliver and perform this Agreement, and this Agreement is duly authorized, and does not and will not violate any provisions of Federal or state law or regulation, or conflict with any other agreement to which Merchant is subject;
C. Merchant has all licenses, if any, required to conduct its business and is qualified to do business in every jurisdiction where it is required to do so;
D. There is no action, suit or proceeding now pending or to Merchant's knowledge, threatened by or against or affecting Merchant which would substantially impair its right to carry on its business as now conducted or adversely affect its financial condition or operations;
E. Each Sales Draft presented to Acquirer for collection is genuine and is not the result of any fraudulent transaction or telemarketing sale or is not being deposited on behalf of any business other than Merchant. Further, Merchant warrants that each Sales Draft is the result of a bona fide Card Transaction for the purchase of goods or services by the Cardholder in the total amount stated on the Sales Draft;
F. Merchant has performed or will perform all of its obligations to the Cardholder in connection with the Card Transaction evidenced thereby;
G. Merchant has complied with Acquirer procedures for accepting Cards, and the Card Transaction does not involve any element of credit or debit for any purpose other than as set forth in this Agreement and shall not be subject to any defense, dispute, offset or counter claim which may be raised by any Cardholder under the Rules, the Consumer Credit Protection Act (15 USC 1601) or other relevant state or federal statutes or regulations;
H. Any Credit Voucher which it issues represents a bona fide refund or adjustment on a Card sale by Merchant with respect to which a Sales Draft has been accepted;
I. All credit and debit card transactions originated by Merchant will be processed through Acquirer under the terms of this Agreement and Merchant will not enter into any similar processing relationship with another processor, without the prior written consent of Acquirer, which consent shall be solely at the discretion of Acquirer.
J. With respect to all Card Transactions that Merchant requests Acquirer to originate, Merchant continuously represents and warrants to Acquirer that:
   1) Each Customer has authorized the debiting and/or crediting of its account;
   2) Each Entry is for an amount the customer has agreed to; and
   3) Each Entry is in all other respects properly authorized.

**3.21 Guarantors**
As a primary inducement to Acquirer to enter into this Agreement, the undersigned Guarantor(s), by signing this Agreement, jointly and severally, unconditionally and irrevocably, guarantee the continuing full and faithful performance and payment by Merchant of each of its duties and obligations to Acquirer pursuant to this Agreement, as it now exists or amended from time to time, with or without notice. Guarantor(s) understands further that Acquirer may proceed directly against Guarantor(s) without first exhausting its remedies against any other person or entity responsible therefore to it or any security held by Acquirer or Merchant. This guarantee will not be discharged or affected by the death of the undersigned, will bind all heirs, administrators, representatives and assigns and may be enforced by or for the benefit of any successor of Acquirer. Guarantor(s) understand that the inducement to Acquirer to enter into this agreement is consideration for the guaranty, and that this guaranty remains in full force and effect even if the Guarantor(s) receive no additional benefit from the guarantee.

**3.22 Privacy Policy**
This Agreement incorporates by reference our Privacy Policy, which may be found at https://paycosmos.com/privacynotice.pdf

**3.23 Definitions**
In addition to terms otherwise defined in this Agreement, capitalized terms shall have the meaning ascribed to them in this section.

"<u>Account</u>" means a commercial checking or demand deposit account maintained by Merchant for the crediting of collected funds and the debiting of fees and charges under this Agreement.

"ACH" means the Automated Clearing House paperless entry system controlled by the Federal Reserve Board.

"Agreement" means the Merchant Application, the Guaranty and these Terms and Conditions, and any supplementary documents referenced herein, and schedules, exhibits and amendments to the foregoing.

"American Express" means the Cards bearing the Marks of, and Card Network operated by, American Express Travel Related Services Company, Inc. or its affiliates.

"Authorization" means a computerized function or a direct phone call to a designated number to examine individual Transactions to obtain approval from the Card Issuer to charge the Card for the amount of the sale in accordance with the terms of this Agreement and the Network Rules.

"Bank" has the meaning set forth on the Merchant Application.

"Card" means (i) a valid credit card or debit card in the form issued under license from a Card Network. ("Bank Card"); or (ii) any other valid credit card or debit card or other payment device approved by Bank and accepted by Merchant.

"Card Issuer" means the financial institution or company which has provided a Card to a Cardholder.

"Card Network" means Visa U.S.A., Inc., MasterCard International, Inc., American Express Travel Related Services Company, Inc., DFS Services LLC (the owner of Discover) and their affiliates, or any other payment networks approved by Bank that provide Cards accepted by Merchant.

"Card Not Present" or "CNP" means that an Imprint of the Card is not obtained at the point-of-sale. "Cardholder" (sometimes referred to as "Card Member" in certain Card Network materials) shall mean any person authorized to use the Cards or the accounts established in connection with the Cards.

"Cardholder Information" means any non-public, sensitive information about a Cardholder or related to a Card, including, but not limited to, any combination of Cardholder name plus the Cardholder's social security number, driver's license or other identification number, or credit or debit card number, or other bank account number.

"Chargeback" means the procedure by which a Transaction (or disputed portion thereof) is returned to Provider by a Card Issuer for any reason, including, but not limited to, cases where such item does not comply with the applicable Network Rules.

"Cash Over" means a Transaction using a Discover Card whereby the Cardholder elects to receive additional cash in excess of the purchase price, all as provided by Network Rules of Discover.

"Credit Voucher" means a document executed by a Merchant evidencing any refund or price adjustment relating to Cards to be credited to a Cardholder account.

"Discover Card" means a Card bearing the Discover Marks and accepted as part of the DFS Services Network.

"Guarantor" has the meaning set forth on the Merchant Application. "Guaranty" has the meaning set forth on the Merchant Application.

"Imprint" means (i) an impression on a Transaction Record manually obtained from a Card through the use of an imprinter, or (ii) the electronic equivalent obtained by swiping a Card through a terminal and electronically capturing Card data and printing a Transaction Record.

"ISO" has the meaning set forth on the Merchant Application "Merchant" has the meaning set forth on the Merchant Application.

"Merchant Application" has the meaning set forth on the Merchant Application.

"Network Rules" means the rules, regulations, releases, interpretations and other requirements (whether contractual or otherwise) imposed or adopted by any Card Networks and related authorities, including without limitation, those of the PCI Security Standards Council, LLC and the National Automated Clearing House Association (including, with respect to EBT, the Quest Operating Rules and with respect to PIN debit cards, the rules, regulations, policies and procedures of the applicable debit network).

"Provider" as provided by the introductory paragraph to these Terms and Conditions, means ISO and Bank together.

"Transaction" means any sale of products or services, or credit for such, from a Merchant for which the Cardholder makes payment through the use of any Card and which is presented to Provider for collection.

"Transaction Record" means evidence of a purchase, rental or lease of goods or services by a Cardholder from, and other payments to, Merchant using a Card, including preauthorized orders and Recurring Transactions (unless the context requires otherwise), regardless of whether the form of such evidence is in paper or electronic form or otherwise.

"Voice Authorization" means a direct phone call to a designated number to obtain credit approval on a Transaction from the Card Issuer, whether by voice or voice-activated systems.

### 3.24 Merchant Statement Key

**Brand-Originated Fee Names** The names given to particular fees by the card brands (Visa, MasterCard, Discover, American Express)

**Statement Fee Name** The names of particular fees as they appear on the Acquirer monthly merchant statement Explanation/Descriptions of a particular fee

#### Fee Descriptions

| Visa Fee Names | Statement Names | Fee Descriptions |
|---|---|---|
| Visa Auth | Auth fee | Authorization Fee on Visa authorizations |
| Visa ARU | ARU auth | Authorization Fee for Automated Response Unit on Visa authorizations |
| Visa Voice Auth | Voice auth | Authorization Fee for Voice Authorization on Visa authorizations |
| VISA APF | APF credit | Acquiring Processing Fee for Visa Credit Transactions |
| VISA APF Debit | APF debit | Acquiring Processing Fee for Visa Debit Transactions |
| VISA Misuse Auth | Misuse auth system | Fee for Misuse of Authorization System on Visa Transactions |
| Visa FANF | FANF | Fixed Acquirer Network Fee for access to Visa networks |
| Visa Integrity Fee | Trans Integrity fee | US domestic debit & prepaid card failing CPS qualifications on Visa transactions |
| Visa Floor Limit Rate | Floor Limit Rate | Transactions without matching authorizations through EQT device on Visa transactions |
| Visa IAF | IAF | International Acquiring Fee on foreign issued Visa transactions |
| Visa ISA | ISA | International Service Assessment on Visa transactions |
| Visa File Transfer | File Transfer | File transfer fee on all Visa transactions |

| MasterCard Fee Names | Statement Names | Fee Descriptions |
|---|---|---|
| MC Auth | Auth fee m | Authorization Fee on MasterCard authorizations |
| MC ARU | ARU auth m | Authorization Fee for Automated Response Unit on MasterCard authorizations |
| MC Voice Auth | Voice auth m | Authorization Fee for Voice Authorization on MasterCard authorizations |
| MC Misuse Fee | Misuse auth system m | Fee for Misuse of Authorization System on MasterCard Transactions |
| MC Acct Inq Rate | Acct Inq Rate | The Account Status Inquiry Service Fee – Intraregional will apply to all MasterCard Account Status Inquiry Service requests (including AVS, CVC2 or both) where the merchant and cardholder are in the same region |
| MC Cross Border/Acq Sup % | Cross Border/Acq Sup | Fees on MasterCard foreign authorizations and/or transactions |
| MC CVC2 | CVC 2 | MasterCard Card Validation Code 2 transaction fee |
| MC DEF | DEF | The Digital Enablement Fee will be assessed on all MasterCard card not present sale transactions. |
| MC NABU | NABU | Network Brand Access Usage for MasterCard authorizations |
| MC Status Inquiry Service Fee | Status Inq Svc Fee | Fee for Status Inquiries on MasterCard authorizations |

| Discover Fee Names | Statement Names | Fee Descriptions |
|---|---|---|
| Discover Network Auth Fee | DNAF | Network Access Fee on Discover authorizations |
| Disc IPF/ISF | IPF/ISF | International Processing Fee/International Service Fee on Discover foreign transactions |
| Disc DUC | DUC | Data Usage Fee on |

| | | |
|---|---|---|
| Disc Auth | Auth fee d | Authorization Fee on Discover transactions authorizations |
| Disc ARU | ARU auth d | Authorization Fee for Automated Response Unit on Discover authorizations |
| Disc Voice Auth | Voice auth d | Authorization Fee for Voice Authorization on Discover authorizations |
| **AXP Fee Names** | **Statement Names** | **Fee Descriptions** |
| Network Fee | | The fee applies to gross American Express card volume |
| Card-Not-Present Fee | | The fee applies to gross card-not-present volume, such as keyed and e-commerce transactions. The CNP surcharge is charged in addition to to the network fee of 0.15%, making the total assessment on card-not-present volume 0.45% |
| Inbound Fee | | The American Express international assessment applies to gross sales volume involving a card issued outside of the United States |
| Data Quality Fee | | The fee applies to any American Express transaction that does not meet data quality standards, e.g. incorrect MID numbers or incorrect MCCs. The fee is 0.75% of the face amount of the transaction amount |

Terms Below Are Additional Terms Applicable Specifically to American Express Card Acceptance (capitalized terms not defined elsewhere in the Agreement shall have the meanings assigned in the American Express Network Rules). With respect to participation in an American Express acceptance program, in the event of a conflict between the terms below and other terms of this Agreement, the terms below shall control with respect to American Express transactions only. Merchant shall be bound by American Express Network Rules, including the Merchant Operating Guide: www. americanexpress.com/merchantopguide.

**3.25 Participation in the American Express OptBlue® Program**
If Merchant elects to participate in the AMERICAN EXPRESS OptBlue Program ("American Express Card Acceptance"), the following terms and conditions apply:

A. Transaction Data. Merchant authorizes Bank and/or its affiliates to submit American Express Transactions to, and receive settlement on such Transactions from, American Express on behalf of Merchant. Merchants shall ensure data quality and shall process transactional data and customer information promptly, accurately, and completely to comply with American Express specifications.

B. Merchant agrees that Bank may disclose to American Express information regarding Merchant and Transactions to American Express, and that American Express may use such information: (i) to perform its responsibilities in connection with American Express Card Acceptance; (ii) to promote American Express; (iii) to perform analytics and create reports; and (iv) for any other lawful business purposes, including commercial marketing communications purposes within the parameters of American Express Card Acceptance, and important transactional or relation- ship communications from American Express. American Express may use the information about Merchant obtained in this Agreement at the time of setup to screen and/or monitor Merchant in connection with American Express marketing and administrative purposes. Merchant agrees it may receive messages from American Express, including important information about American Express products, services, and resources available to its business. These messages may be sent to the mailing address, phone numbers, email addresses or fax numbers of Merchant. Merchant may be contacted at its wireless telephone number and the communications sent may include autodialed short message service (SMS or "text") messages or automated or pre- recorded calls. Merchant agrees that it may be sent fax communications.

C. Marketing Message Opt-Out. Merchant may opt-out of receiving future commercial marketing communications from American Express by contacting ISO; however, Merchant may continue to receive marketing communications while American Express updates its records to reflect this choice. Opting out of commercial marketing communications will not preclude Merchant from receiving important transactional or relationship messages from American Express. See page three of merchant agreement for opt-out area.

D. Merchant acknowledges it may be converted from the OptBlue to a direct Card acceptance relationship with American Express if and when it becomes a High Charge Volume Merchant in accordance with AXP rules for "High CV Merchant Conversions". High CV Merchant is a OptBlue Merchant with either (i) greater than USD $1,000,000 in Charge Volume in a rolling twelve (12) month period or (ii) greater than USD $100,000 in Charge Volume in any three (3) consecutive months. For clarification, if an OptBlue Merchant has multiple Establishments under the same tax identification number (TIN), the Charge Volume from all Establishments shall be summed together when determining whether the Program Merchant has exceeded the thresholds above in American Express' sole discretion. This acknowledgement is accepted by merchant signature on application and includes express agreement that, upon conversion, (i) the Merchant will be bound by American Express' then-current Card Acceptance Agreement; and (ii) American Express will set pricing and other fees payable by the for Card acceptance.

E. OptBlue accepting Merchants shall not assign to any third party any payments due to it under their respective Merchant Agreements, and all indebtedness arising from Charges will be for bona fide sales of goods and services (or both) at its Establishments and free of liens, claims, and encumbrances other than ordinary sales taxes; provided, however, that the Merchant may sell and assign future Transaction receivables to Participant, its affiliated entities and/or any other cash advance funding source that partners with Participant or its affiliated entities, without consent of American Express.

F. American Express retains a third-party beneficiary provision, conferring on American Express third-party beneficiary rights but not obligations, to this Merchant Agreement which fully provides American Express with the ability to enforce the terms of the Merchant Agreement against the Program Merchant at it's own option.

G. American Express Opt-Out. Merchant may opt out of accepting American Express at any time without directly or indirectly affecting its rights to accept other Cards.

H. Bank and ISO have the right to terminate Merchant's participation in American Express Card Acceptance immediately upon written notice to Merchant: (i) if Merchant breaches any of the provisions of this Section 46 or any other terms of this Agreement applicable to American Express Card Acceptance; or (ii) for cause or fraudulent or other activity, or upon American Express's request. In the event Merchant's participation in American Express Card Acceptance is terminated for any reason, Merchant must immediately remove all American Express branding and marks from Merchant's website and wherever else they are displayed; (iii) Cards if it breaches any of the provisions in this Section 3.2, "General Requirements" or the *American Express Merchant Operating Guide*, which is found at www.americanexpress.com/merchantopguide.

I. Refund Policies. Merchant's refund policies for American Express-related Transactions must be at least as favorable as its refund policy for purchase with any Non-Credit Payment Forms, and the refund policy must be disclosed to Cardmembers at the time of purchase and in compliance with Applicable Law. For the purpose of this subsection 46(i), Non-Credit Payment Forms means any forms of payment other than a (i) general purpose credit or charge card; or (ii) payment card brand name that references both general purpose credit or charge cards and debit cards, such as "Visa" or "MasterCard". Merchant may not bill or attempt to collect from any cardholder for any American Express-related Transaction unless a Chargeback has been exercised, Merchant has fully paid for such Chargeback, and it otherwise has the right to do so.

J. Merchant must accept American Express as payment for goods and services (other than those goods and services prohibited by this Agreement or Applicable Law) sold, or (if applicable) for charitable contributions made at all of its business locations and websites, except as expressly permitted by state statute. Merchant is jointly and severally liable for the obligations of Mer- chant's business locations and websites under this Agreement.

K. Merchant or American Express may elect to resolve any claim against each other, or against Bank or ISO with respect to American Express-related Transactions, by individual, binding arbitration, decided by a neutral arbitrator.

L. Merchant will comply in full with the American Express Merchant Operating Guide (as the same may be amended from time to time) which can be obtained online at www.americanexpress. com/merchantopguide.

M. American Express has the right to modify the terms of this Section 46 and to terminate Merchant's acceptance of American Express-related Transactions and to require an investigation of Merchant's activities with respect to American Express-related transactions.

N. Establishment Closing. If Merchant closes any of its Establishments, Merchant must follow these guidelines: (i) notify ISO immediately; (ii) policies must be conveyed to the Cardholder prior to completion of the Transaction and printed on the copy of a receipt or Transaction record the Cardholder signs; (iii) if not providing refunds or exchanges, post notices indicating that all sales are final (e.g., at the front doors, by the cash registers, on the Transaction record and on websites and catalogs); (iv) return and cancellation policies must be clearly disclosed at the time of sale; and (v) for Advance Payment Charges or Delayed Delivery Charges, Merchant must either deliver the goods or services for which Merchant has already charged the Cardholder or issue Credit for any portion of the Transaction for which Merchant has not delivered the goods or services.

# 4 Tier Pricing

Schedule A – Rates & Fees

Merchant Business Name: Peptide Tech, LLC          Date: 07/09/2024

| Tiered Pricing | Card Type | Discount Rate | Card Type | Discount Rate | Card Type | Discount Rate | Card Type | Discount Rate | Visa/MC/Disc/AMEX Transaction Fee |
|---|---|---|---|---|---|---|---|---|---|
| Reg Qualified Debit Rate | Visa | 4.95 % | MasterCard | 4.95 % | Discover | 4.95 % | AMEX | 4.95 % | $ 0.15 |
| Qualified Rate | Visa | 4.95 % | MasterCard | 4.95 % | Discover | 4.95 % | AMEX | 4.95 % | $ 0.15 |
| Mid Qualified Rate | Visa | 4.95 % | MasterCard | 4.95 % | Discover | 4.95 % | AMEX | 4.95 % | $ 0.15 |
| Non Qualified Rate | Visa | 4.95 % | MasterCard | 4.95 % | Discover | 4.95 % | AMEX | 4.95 % | $ 0.15 |

## Other Fees

| | | | | | |
|---|---|---|---|---|---|
| Annual 1099K Reporting | $ 24.50 | Monthly Online Reporting Fee | $ 4.95 | Terminal Download Fee | $ 0.00 |
| Application Fee | $ 0.00 | Per Retrieval Request Fee | $ 10.00 | Authorization Fee | $ 0.1000 |
| Annual Fee | $ 24.50 | GPRS Setup Fee | $ 0.00 | Voice Per Auth Fee | $ 2.00 |
| Monthly Maintenance | $ 10.00 | Monthly GPRS Terminal Fee | $ 0.00 | Monthly Next Day Funding | $ 0.00 |
| Per Batch Fee | $ 0.25 | Monthly PCI Compliance Fee | $ 4.95 | Equipment Fee* | $ 0.00 |
| Per Chargeback Fee | $ 25.00 | Monthly Regulatory Fee | $ 4.95 | * ☐ One Time   ☐ Monthly | |
| Monthly Minimum Fee | $ 50.00 | Address Verification Fee | $ 0.10 | ☐ Net ACH   ☐ Next Day Funding | |

**Special Fee Conditions / Notes:**

## Fee Disclosures

**Dues & Assessments**
Visa® Assessments are calculated at 14bp and (debit) at 13bp. MasterCard® transactions are calculated at 13bp and transactions equal to or greater than $1,000 will be calculated at 14bp. Discover Network® transactions are calculated at 14bp.
*Card network dues and assessments are subject to periodic adjustments.*

**Reg Qualified Debit Rate**
Swiped consumer debit/checkcard transactions that are electronically authorized and closed in a daily batch and include all minimum authorization and transaction information as required for the Visa Custom Pay-ment Service ("CPS") Retail Debit or MasterCard Merit III Debit or Discover Retail Debit Interchange or AXP Retail Debit

**Qualified Retail Rate**
Swiped consumer credit card transactions that are electronically authorized and closed in a daily batch and include all minimum authorization and transaction information as required for the Visa Custom Payment Service ("CPS") Retail or MasterCard Merit III or Discover Retail or American Express Interchange programs

**Mid Qualified Rate**
Includes consumer credit and check card transactions that are: a) key-entered; b) not settled within two business days; c) made with cards that have missing or unreadable magnetic strip data; d) made using a Visa Rewards card at a T&E merchant; e) made when the card is not present.

**Non Qualified Rate**
All bankcard transactions that do not meet the requirements of the other rate categories. Also includes, but not limited to, any transactions made on any Visa Corporate and Signature card types, MasterCard Com-mercial or WorldCard card types or any foreign cards, Discover Commercial Cards or American Express Cards.

**Visa/MasterCard/Discover/AXP Card Brand Fees**
Other fee categories charged by Visa, MasterCard, Discover and/or American Express, which include but are not limited to:
  APF Credit (Visa Acquirer Processing Credit Fee) per Auth………………$0.02
  APF Debit (Visa Acquirer Processing Debit Fee) per Auth…………………$0.02
  Visa File Transfer……………………………………………………………$0.0018
  Misuse auth system (MasterCard Misuse of Auth Fee) per Auth………….$0.045
  Visa Misuse Auth (Visa Misuse of Authorization Fee) per Auth……………$0.09
  Floor Limit Rate (Visa Floor Limit Fee) per Auth…………………………….$0.20

Trans Integrity fee (Visa Debit Integrity Fee) per Auth……………………….$0.10
FANF (Visa Fixed Acquirer Network Fee) per location per month…………Pass-Through
NABU (MasterCard Network Access & Brand Usage Fee) per Auth………$0.03
Status Inq Svc (MasterCard Status Inquiry Service Fee) per Auth…………$0.025
CVC2 (MC CVC2 fee per trans that are acquired in the US region)………$0.0025
DEF (MasterCard Digital Enablement Fee)……………………………………0.01%
MC Misuse Integrity Fee……………………………………………………….0.25%
DUC (Discover Data Usage Charge) per Trans………………………………$0.0025
DNAF (Discover Network Authorization Fee) per Auth………………………$0.0190
Assessment Fee (Applies to Gross AXP Card Volume)……………………..0.165%
Card-Not-Present Fee (Applies to Gross AXP CNP Volume)………………0.30%
Data Quality Fee (AXP trans that do not meet quality standards)…………0.75%

**Visa/MasterCard/Discover/AXP International Fees**
IAF (Visa International Acquirer Fee)…………………………………………0.45%
IAF (Visa International Acquirer Fee–higher risk merchant categories)…..0.90%
ISA (Visa International Service Assessment Fee)……………………………1.00%
Cross Border/Acq Sup (MC Cross Border/Acquirer Support Fee)…………1.45%
IPF/ISF (Discover International Processing Service Fee)…………………..1.30%
Inbound Fee (AXP per International transaction Assessment……………..1.00%

**Other Fees**
24/7 Help Desk Support………………………………………………………Variable
Dispute Resolution Fee (Pre-Arbitration)……………………………………$35.00
Merchant Link Authorization surcharge (Micros)……………………………$0.07
Per ACH Reject Fee……………………………………………………………$35.00
Annual PIN Debit Network Fee………………………………………………Variable
MasterCard Service Provider Fee……………………………………………Variable
PCI Non-Compliance Fee……………………………………………………$50.00 month
Unmatched Refunds…………………………………………………………$50.00
PIN-Debit Voids………………………………………………………………$50.00
MC Location Fee………………………………………………………………$2.50

---

James Thompson
Print Name of Owner, Responsible Individual

X *James Thompson*
Signature of Owner, Responsible Individual

X _____
Authorized Officer of paycosmos as a DBA of Transmodus Corp

X _____
Authorized Officer of Avidia Bank

Version: 3.0.2          paycosmos® is a registered ISO/MSP of Avidia Bank, Hudson, MA